**APOLLO TECHNOLOGIES
CORP., Plaintiff,**

v.

**CENTROSPHERE INDUSTRIAL
CORP., Defendant.**

Civ. A. No. 92–3712 (AJL).

United States District Court,
D. New Jersey.

Sept. 25, 1992.

Martin H. Samson, Michael J. Silverberg, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, David M. Hyman, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, N.J., for plaintiff.

Max Manshel, South Orange, N.J., Joseph B. Blaustein, Philip J. Karlin, A Professional Law Corp., Los Angeles, Cal., for defendant.

## TABLE OF CONTENTS

Introduction ................................................................. 1166
Facts ....................................................................... 1167
 A. The Parties and Other Significant Persons............................ 1167
 B. Apollo's Fuel Additives and Pollution Control Technology ............. 1168
 C. The Bid for the NAPOCOR Trial Contract ........................... 1169
 1. Apollo's Version of Events ..................................... 1169
 2. Centrosphere's Version of Events............................... 1171
 D. The Agency Contracts ............................................. 1171
 1. The First Agency Contract ..................................... 1172
 2. The Second Agency Contract ................................... 1172
 E. Performance of the Trial Contract ................................... 1174
 F. Completion of the Trial Contract .................................... 1175
 G. Relationship Between Apollo and Centrosphere After 1 January 1992.... 1176
 H. Recent Dealings Between Apollo and NAPOCOR ...................... 1178
 I. Recent Actions By Centrosphere ..................................... 1178
 J. The Complaint..................................................... 1179
Discussion.................................................................... 1181
 A. Personal Jurisdiction............................................... 1181
 1. Jurisdiction Pursuant to the New Jersey Long Arm Rule........... 1181
 a. Minimum Contracts ......................................... 1182
 b. Fair Play and Substantial Justice ............................. 1186
 2. Adequacy of Service of Process ................................. 1187
 B. Preliminary Injunction ............................................. 1190
 1. Standard of Review ........................................... 1190
 2. Likelihood of Success on the Merits ............................ 1191
 a. Breach of Contract .......................................... 1192
 b. Breach of Fiduciary Duty..................................... 1195
 (1) An Agent's Duties to its Principal ......................... 1195
 (2) Termination of the Agency Relationship.................... 1196
 (3) What Constitute Trade Secrets............................. 1197
 (4) Apollo's Claim that Centrosphere Breached Its Fiduciary Duty By Purporting to Act as Apollo's Agent Following Termination of the Second Agency Contract .............. 1198
 (5) Apollo's Claim that Centrosphere Breached Its Fiduciary Duty By Utilizing Confidential Information and Trade Secrets in Competition with Apollo....................... 1200
 c. Unfair Competition .......................................... 1202
 d. Intentional Interference With Prospective Contractual Relations ..................................................... 1205
 3. Irreparable Injury.............................................. 1206
 a. The New Contract and the Interim Contract................... 1208
 b. The Potential Contracts....................................... 1209
 c. Trade Secrets ............................................... 1209
 d. Injunctions Even Where Money Damages Appropriate........... 1210
 4. Balance of Hardships ......................................... 1211
 5. Public Interest................................................ 1211
Conclusion ................................................................... 1212

---

## OPINION

LECHNER, District Judge.

*Introduction*

This is an action brought by plaintiff Apollo Technologies Corp. ("Apollo") against Centrosphere Industrial Corp. ("Centrosphere") arising out of an agency agreement in which Centrosphere agreed to market fuel additives and equipment on behalf of Apollo to the National Power Corporation ("NAPOCOR") of the Republic of the Philippines (the "Philippines"). Apollo alleges jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

On 2 September 1992, Apollo applied for a temporary restraining order ("TRO") and a preliminary injunction[1] (the Preliminary

---

**1.** Apollo has submitted the following in support of its motion for a TRO and a preliminary

injunction: Plaintiff's Brief in Support of a Motion For a Temporary Restraining Order (the

Injunction") to restrain and enjoin Centrosphere [2] from (1) competing with Apollo in the sale to NAPOCOR of fuel additives, equipment or other products or technologies competitive with those manufactured or sold by Apollo, (2) interfering in Apollo's sale of fuel additives to NAPOCOR, (3) utilizing or disclosing confidential information or trade secrets received from Apollo, including technologies and methods utilized in the selection, testing, operation and evaluation of Apollo's fuel additives and equipment and (4) acting or purporting to act as an agent of, or offering to sell fuel additives, equipment or other products made or sold by, Apollo. Moving Brief at 1; Becker Aff., ¶ 1.

Centrosphere submitted a cross motion to dismiss the action for insufficient service of process and for lack of personal jurisdiction over Centrosphere pursuant to Fed.R.Civ.P. 4.[3] Opp. Brief at 1; WidjajA Aff., ¶ 1. In the alternative, should a preliminary injunction be granted to Apollo, Centrosphere cross-moves for a mutual preliminary injunction enjoining Apollo from: (1) refusing to provide Centrosphere with fuel additives, equipment and other products manufactured and sold by Apollo, for sale by Centrosphere to NAPOCOR, (2) interfering with Centrosphere in its relationship

with NAPOCOR and (3) dealing directly with NAPOCOR, or dealing through organizations other than Centrosphere, for the purpose of providing fuel additives and related technologies to NAPOCOR. Opp. Brief at 1; Widjaja Aff., ¶ 1.

On 2 September 1992, Judge Alfred M. Wolin of this court denied Apollo's request for a TRO and ordered Centrosphere to show cause before this court on 18 September 1992 as to why an order granting the Preliminary Injunction should not issue. On 24 September 1992, oral argument was held[4] to determine (1) whether personal jurisdiction exists over Centrosphere, (2) the adequacy of the process served on Centrosphere and (3) whether any preliminary injunction should issue. For the reasons set forth below, the Preliminary Injunction is denied; the cross-motion to dismiss or, if the Preliminary Injunction was granted, to make the Preliminary Injunction mutually enforceable, is also denied.

*Facts* [5]

A. The Parties and Other Significant Persons

Apollo is a Delaware corporation with its principal place of business in New Jersey. Verified Complaint, filed 1 September 1992 (the "Complaint"), ¶ 1; Becker Aff., ¶ 8.

"Moving Brief"); Affidavit of Donald G. Becker (the "Becker Aff."); Plaintiff's Reply Brief in Support of Motion for a Preliminary Injunction (the "Reply Brief"); Reply Affidavit of Dr. Ira Kukin (the "Kukin Aff."); Exhibits to Reply Affidavit of Dr. Ira Kukin (the "Kukin Exhibits") (submitted as separate document); Reply Affidavit of Donald G. Becker (the "Becker Reply Aff."); Reply Affidavit of William Pepe (the "Pepe Aff.").

Centrosphere has submitted the following in opposition to the Apollo motion: Defendant's Brief in Opposition to Motion For Preliminary Injunction (the "Opp. Brief") and Affidavit of Alex Widjaja (the "Widjaja Aff."). On 24 September 1992, the morning of oral argument, Centrosphere submitted an Errata to Defendant's Brief in Opposition to Motion for Preliminary Injunction, correcting grammatical, typographical and case citation errors.

**2.** Apollo asks for an injunction restraining "Centrosphere *and* its directors, officers, shareholders, employees and agents." Moving Brief at 1 (emphasis added). Nevertheless, the only named defendant in this action is the corporate entity of Centrosphere. Centrosphere's directors, officers, shareholders, employees and

agents are not defendants in this action and can only be enjoined to the extent they act on behalf of Centrosphere.

**3.** Centrosphere appears to be moving to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), (3), (4) although Centrosphere fails to cite this rule.

**4.** At oral argument, the parties requested an expedited trial. The parties were informed a trial could commence in approximately two weeks, 13 October 1992. The parties were to meet immediately following oral argument to discuss their respective needs for trial and to propose an expedited schedule for discovery and trial. After meeting for approximately ninety minutes, the parties reported they could not agree. Max Manshel, Esq., representing Centrosphere, indicated Centrosphere would not likely be able to proceed to trial prior to 1 January 1993. Michael Silverberg, Esq., representing Apollo, stated indicated he could not set up an expedited schedule until he first consulted with Apollo. A status conference was scheduled for 1 October 1992, as requested by counsel.

**5.** Many of the facts of this matter are contested. *See* Kukin Aff., ¶ 1.

Apollo is engaged in the sale of pollution control chemicals and related equipment with a focus in the sale of fuel additives and related equipment and technologies. Complaint, ¶ 1; Becker Aff., ¶ 8. It does not appear Apollo is licensed to do business in the Philippines. Widjaja Aff., ¶ 32, Ex. 10 (Affidavit of Julieta Ramos sworn to 9 September 1992).

The founder and president of Apollo is Dr. Ira Kukin ("Kukin"). Kukin appears to be an expert in the pollution control field and an inventor of more than twenty-five products designed to control pollution and maximize energy efficiency through chemical means. Becker Aff., ¶ 9. The chief operating officer and vice president of Apollo is Donald G. Becker ("Becker"). Becker Aff., ¶ 1; Becker Reply Aff., ¶ 1. The vice president of engineering for Apollo is William Pepe ("Pepe"). Pepe Aff., ¶ 1.

Centrosphere is a corporation organized under the laws of the Philippines with its sole place of business in the Philippines. Widjaja Aff., ¶ 4; Complaint, ¶ 2; Opp. Brief at 1. Centrosphere is neither authorized to do business in either the United States or its territories nor does it maintain any offices in the United States. Widjaja Aff., ¶ 4; Opp. Brief at 1–2.

Only seven shareholders own stock in Centrosphere. Becker Aff., ¶ 37. These shareholders include Marian Mercado–De-Leon ("Mercado–DeLeon"), Fidel L. Bermudez ("Bermudez") and Ed Depano ("Depano"). Id.; Complaint, ¶ 4. Mercado–De-Leon is also the former president and general manager of Centrosphere. Widjaja Aff., ¶ 12; Becker Aff., ¶ 37.

The president of Centrosphere is Alexander Widjaja ("Widjaja"). Widjaja Aff., ¶¶ 1, 4; Complaint, ¶ 4; Becker Aff., ¶ 41. Widjaja became president of Centrosphere in April 1992. Widjaja Aff., ¶ 4. In addition to Centrosphere, since 1985 Widjaja has been an officer or shareholder in several Philippines corporations which have supplied goods and services to Centrosphere. Id., ¶ 5; Opp. Brief at 2. Two of these corporations are Joseph London ("London") and East/West Consolidated Services ("East/West"). Widjaja Aff., ¶ 5; Opp. Brief at 2.

Centrosphere was formed in April 1990 for the purpose of supplying fuel additives and related technology to entities in the Philippines. Widjaja Aff., ¶ 10; Opp. Brief at 2–3. Prior to April 1990, efforts had been made by Widjaja and East/West to establish interest in such products in the Philippines. Widjaja Aff., ¶ 10; Opp. Brief at 2.

### B. Apollo's Fuel Additives and Pollution Control Technology

Apollo sells pollution control chemicals and related equipment to customers throughout the world, including utility customers such as NAPOCOR, the Israel Electric Company, the Commission Federal de Electricidad in Mexico and Public Service Electric & Gas in New Jersey. Becker Aff., ¶ 8; Kukin Exhibits, Ex. 4. Chief among Apollo's pollution control products are fuel additives. Complaint, ¶ 1. These fuel additives are used to make oil fired boilers at utility power plants operate more efficiently and for longer periods of time without the need for maintenance and repair. Becker Aff., ¶ 11. In addition, these additives reduce air pollution by reducing the emissions produced by power plant boilers. Id.

Apollo holds patents covering the formulations of many of its fuel additives, including those that were marketed to NAPOCOR. Id., ¶ 12. Apollo also holds patents on the various forms of electronic equipment utilized to inject the additives into the boilers. Id.

According to Apollo, operating the fuel additive system requires a highly specialized knowledge. Id., ¶¶ 13–14. For instance, Apollo indicates that knowledge of (1) the specific rates of additive feed, (2) the proper location of additive injection ports within the boilers, (3) the appropriate time to initiate and shut down application of the additives, (4) the methods of testing flue gases to determine the effectiveness of the products and (5) the methods for operating the feed equipment during various boiler operating conditions is essential

to successful operation of the system. *Id.,* ¶ 13. If, for example, the additives are supplied at the wrong time or in the wrong dose, the additives could cause the boiler to shut down rather than enhance its performance. *Id.,* ¶ 14.

Apollo emphasizes that it "takes great pains to preserve the confidentiality" of this information. Complaint, ¶ 18; Becker Aff., ¶ 15. Such information is disclosed only when essential to Apollo's operations and then only if the party receiving the information signs a confidentiality agreement with respect to the disclosure. Complaint, ¶ 18; Becker Aff., ¶ 15. Apollo states such agreements are obtained from "all Apollo employees, as well as any agents, testing laboratories and outside manufacturers that Apollo utilizes." Complaint, ¶ 18; Becker Aff., ¶ 15.

## C. The Bid for the NAPOCOR Trial Contract

In 1989 or 1990, NAPOCOR invited interested parties to submit bids for a four month trial contract (the "Trial Contract") to control gaseous waste from its Malaya Thermal Power Plant, Units 1 and 2 (the "Malaya Plant").[6] Becker Aff., ¶ 16; Widjaja Aff., ¶ 11. The parties were asked to supply a product which could minimize the damaging effects caused by flue gases to power production boilers, when those boilers utilize fuel oil with a high sulfur and high vanadium content. Becker Aff., ¶ 16.

In October 1990, Centrosphere submitted a bid to NAPOCOR. *Id.,* ¶ 18; Opp. Brief at 3. On 14 December 1990, NAPOCOR awarded the Trial Contract to Centrosphere. Becker Aff., ¶ 19, Ex. B (copy of Trial Contract); Widjaja Aff., ¶ 11, Ex. 2 (same). Both Apollo and Centrosphere acknowledge Centrosphere solicited the assistance of Apollo in performing the Trial Contract. When this assistance was solicited, however, is disputed.

### 1. *Apollo's Version of Events*

According to Apollo, Centrosphere contacted Apollo prior to bidding. Becker

Aff., ¶ 17; Kukin Aff., ¶ 5. Apollo contends the events occurred as follows. In April 1990, Apollo received a letter, dated 16 April 1990 (the "16 April Letter"), from Centrosphere indicating NAPOCOR was considering the use of chemical additives to improve the efficiency of boilers and was suggesting a trial program at the Malaya Plant (the "Trial Program"). Kukin Aff., ¶ 5(a); Kukin Exhibits, Ex. 1 (16 April Letter). The 16 April Letter specifically stated:

> [NAPOCOR] requested [Centrosphere] to submit a detailed study on the use of chemical additive[s] and to come out with a proposal for [the T]rial [P]rogram on its Malaya [ ] Plant.... It took us only a short time to know that [Apollo] is the leader in this field of chemical additives. With your impressive product and the work we have made to introduce th[e Trial P]rogram of chemical additives plus our established relations with [NAPOCOR], we can look forward to a successful joint venture with your company.

Kukin Exhibits, Ex. 1. Centrosphere concluded the 16 April Letter by requesting permission to send "one or two of our key people to your company" to discuss the proposed joint venture. *Id.*

It is unknown whether Apollo responded to the 16 April Letter, but apparently it was initially uninterested in Centrosphere's offer. Kukin Aff., ¶ 5(a). In July 1990, Apollo received another letter from Centrosphere, dated 9 July 1990 (the "9 July Letter"), indicating that NAPOCOR had begun to take bids for the Trial Program. *Id.;* Kukin Exhibits, Ex. 2 (9 July Letter). The 9 July Letter stated: "As we stated in [the 16 April Letter, Centrosphere is] interested in representing [Apollo] in this bidding." Kukin Exhibits, Ex. 2. The 9 July Letter reiterated the offer to send Centrosphere personnel to Apollo's offices in New Jersey and suggested that Apollo temporarily certify Centrosphere as a distributor of Apollo's product to enable Centrosphere

---

6. The parties apparently disagree as to when NAPOCOR requested bids for fuel additive testing at the Malaya Plant. Apollo states that bids were requested in 1989, *see* Becker Aff., ¶ 16, while Centrosphere states that bids were invited in September 1990, *see* Widjaja Aff., ¶ 11.

to make the bid to NAPOCOR. *Id.;* Kukin Aff., ¶ 5(b).

On 10 July 1990, Apollo replied to Centrosphere. Kukin Aff., ¶ 5(c); Kukin Exhibits, Ex. 3 (letter from Kukin to Mercado–DeLeon, dated 10 July 1990 (the "10 July Letter")). Apollo expressed reservation about proceeding with Centrosphere's proposal due to Apollo's unfamiliarity with Centrosphere, the expense of the Trial Program and the uneasy political climate in the Philippines. Kukin Aff., ¶ 5(c); Kukin Exhibits, Ex. 3. Nevertheless, Apollo authorized Centrosphere to go ahead with the bidding and granted Centrosphere a certificate of distributorship. Kukin Aff., ¶ 5(c); Becker Aff., ¶ 17; Kukin Exhibits, Exs. 3, 4 (Certificate of Distributorship from Apollo to Centrosphere, dated 10 July 1990). Although the 10 July Letter indicated this distributorship was to be temporary, the Certificate contains no indication of temporariness. Kukin Exhibits, Exs. 3–4.

By the 10 July Letter, Apollo supplied Centrosphere with the technical, product and customer information needed to complete a proposal and bid request to NAPOCOR for the Trial Program. Becker Aff., ¶ 17; Kukin Exhibits, Exs. 3–4. In October 1990, Centrosphere advised Apollo that NAPOCOR was going to award Centrosphere the Trial Contract. Kukin Exhibits, Ex. 5 (letter from Widjaja to Kukin and Pepe, dated 22 October 1990 (the "22 October Letter")).[7]

In November 1990, the parties exchanged more correspondence in anticipation of being awarded the Trial Contract. In a memorandum, dated 7 November 1990,[8] Apollo apparently quoted Centrosphere prices for a number of Apollo's fuel additive products and reviewed the terms

under which it would do business with Centrosphere. Kukin Aff., ¶ 5(e). Apollo also asserts it informed Centrosphere that it would begin assembling the additive and test equipment once Apollo received a purchase order and a letter of credit (the "Letter of Credit") from either Centrosphere or NAPOCOR. Kukin Aff., ¶ 5(e).

On 8 November 1990, Centrosphere replied to Apollo and requested that Apollo's delivery of the additives be made within seventy-five days of receipt by Apollo of the Letter of Credit. *Id.,* ¶ 5(f); Kukin Exhibits, Ex. 6 (letter from Widjaja to Pepe, dated 8 November 1990). On 9 November 1990, Apollo informed Centrosphere that Apollo would attempt to deliver the additives and equipment within seventy-five days after receipt of the Letter of Credit but could not guarantee this turnaround time. Kukin Aff., ¶ 5(f); Kukin Exhibits, Ex. 7 (letter from Pepe to Widjaja dated, 9 November 1990 (the "9 November Letter")). The 9 November Letter requested that Centrosphere send its personnel to Apollo's manufacturing facility in Israel for training in Apollo's fuel additives systems technology. Kukin Exhibits, Ex. 7. The 9 November Letter also indicated that either Centrosphere or Apollo could sign the Trial Contract with NAPOCOR; in either event, Centrosphere would receive a fifteen percent commission from the sale of Apollo's products. *Id.*

On 14 December 1990, NAPOCOR awarded the Trial Contract to Centrosphere.[9] Becker Aff., ¶ 19, Ex. B (copy of Trial Contract); Widjaja Aff., ¶ 11, Ex. 2 (same). NAPOCOR agreed to pay nearly two million dollars (the "Purchase Price") in return for a supply of fuel additives and

---

7. Although Apollo claims that Centrosphere informed Apollo that Apollo was to be granted the Trial Contract, the 22 October Letter does not support this contention. Kukin Aff., ¶ 5(d); Kukin Exhibits, Ex. 5. The 22 October Letter from Centrosphere states: "We are glad to inform you of the result of the bidding for the fuel additive of [the] Malaya Plant. After a really stiff competition from four (4) other companies, we finally succeeded, in convincing [NAPOCOR's] bidding committee to negotiate the award in *our* favor, thanks to *our* inside contacts." Kukin Exhibits, Ex. 5 (emphasis added).

8. Apollo has not provided a copy of this memorandum despite the fact that the Kukin Aff. quotes it repeatedly.

9. Apollo contends Centrosphere submitted its bid and was awarded the Trial Contract as the representative for Apollo. Becker Aff., ¶ 19. The Trial Contract neither mentions Apollo nor indicates Centrosphere is awarded the contract as anything other than as a principal. Becker Aff., Ex. B; Opp. Brief at 5, Ex. 1.

related technologies on a four month trial basis. Becker Aff., ¶¶ 18–19; Complaint, ¶ 7; Widjaja Aff., ¶ 13. Forty percent of the Purchase Price was payable upon delivery of the additives to NAPOCOR. Becker Aff., ¶ 19, Ex. B.; Widjaja Aff., Ex. 2 Payment of the balance of the Purchase Price was dependent on the additives meeting NAPOCOR's specific objectives. Becker Aff., ¶ 19.

2. *Centrosphere's Version of Events*

Centrosphere argues it contacted Apollo only after it won the bid. Opp. Brief at 3. Centrosphere states: "Having won the bid, but lacking the requisite technology and financing to support this project on its own, Centrosphere contacted Apollo." *Id.* Centrosphere adds that the Trial Contract listed the types of fuel additives to be supplied generically and without reference to brand names or specific manufacturers. *Id.*

Apollo attempts to rebut Centrosphere's position by contending that Centrosphere could not have submitted the bid without its assistance. Complaint, ¶ 2; Becker Aff., ¶ 4. Specifically, Apollo asserts that, prior to Centrosphere's contact with Apollo, Centrosphere had no business dealings or experience with air pollution control chemicals or fuel additives. Complaint, ¶ 2; Becker Aff., ¶ 4; Moving Brief at 7.

It appears, however, that Widjaja and Centrosphere may have developed contacts at NAPOCOR and some experience in fuel additive technology prior to its contact with Apollo. Widjaja Aff., ¶¶ 6–9. According to Centrosphere, London, East/West and Centrosphere had supplied NAPOCOR with "coatings, chemicals, supplies, fuel additives and expertise in their application," particularly in the form of paints and water purification chemicals and systems. *Id.*, ¶ 6; Opp. Brief at 2.

Centrosphere states that in 1987 or 1988, while Widjaja was the Executive Vice President of East/West, the company was approached by Dr. Alfred E. Kober ("Kober") regarding the marketing of fuel additive and related technologies in the Philippines. Widjaja Aff., ¶ 8; Opp. Brief at 2. Kober

was a former scientist at Apollo for ten years and was knowledgeable in fuel additive technology. Becker Aff., Ex. Q; Widjaja Aff., ¶ 8. Under Kober's direction, East/West began marketing fuel additives and related technologies in the Philippines but was unsuccessful in these efforts. Widjaja Aff., ¶ 8; Opp. Brief at 2. As evidenced by a letter sent by Apollo to East/West in February 1989, Apollo was aware that East/West was working with Kober and was marketing fuel additives in the Philippines. Widjaja Aff., ¶ 9, Ex. 1 (letter from Kukin to Tristan Calasanz, dated 15 February 1989).

D. The Agency Contracts

On 31 December 1990, Apollo and Centrosphere entered into two contracts establishing a written agency relationship (collectively, the "Agency Contracts") to assist in performance of the Trial Contract. Complaint, ¶¶ 8, 38; Becker Aff., ¶ 20; Kukin Aff., ¶ 5(k); Widjaja Aff., ¶ 15, Ex. 3 (copies of Agency Contracts). Negotiations occurred over the four day period from 28. December 1990 to 31 December 1990. Widjaja Aff., ¶ 15; Kukin Aff., ¶ 5(j).

The Agency Contracts were negotiated and executed at Apollo's offices in New Jersey. Becker Aff., ¶ 20; Kukin Aff., ¶ 5(i); Widjaja Aff., ¶ 15. Present during the negotiations were Widjaja, Mercado–DeLeon and Reggie Liongson ("Liongson") for Centrosphere and Kukin, Becker and William Pepe ("Pepe") for Apollo.[10] Widjaja Aff., ¶ 15; Opp. Brief at 3–5; Kukin Aff., ¶ 5(j). Neither party appears to have been represented by counsel at any point throughout the four day negotiating period. Kukin Aff., ¶ 5(j); Widjaja Aff., ¶ 15. At the conclusion of the negotiations, Mercado–DeLeon remained in New Jersey while Widjaja and Liongson returned to the Philippines. Widjaja Aff., ¶ 18.

According to Centrosphere, the parties had general discussions about the "fuel additive supply situation" in the Philippines on 28 December 1990. Widjaja Aff., ¶ 15; Opp. Brief at 4. These discussions took

---

**10.** Liongson apparently is Widjaja's secretary. Widjaja Aff., ¶ 15.

place at the hotel in which the Centrosphere personnel were staying. Widjaja Aff., ¶ 15. On 29 December 1990, the parties resumed discussions at Apollo's offices and discussed the Trial Program and the terms for the Agency Contracts. *Id.* On 31 December 1990,[11] Apollo and Centrosphere signed two contracts. *Id.;* Kukin Aff., ¶ 5(k).

### 1. *The First Agency Contract*

The first contract (the "First Agency Contract") was entitled the "Agreement for Trial at Malaya Power Station of NAPOCOR." Widjaja Aff., Ex. 3. The First Agency Contract memorialized the discussions of 29 December 1990 and set forth the respective obligations, financial and otherwise, of Apollo and Centrosphere as they specifically related to the performance of the Trial Contract. *Id.;* Opp. Brief at 4. During negotiations, Centrosphere suggested a number of changes be made to the First Agency Contract and signed the First Agency Contract once those changes were implemented.[12] Widjaja Aff., ¶ 15. The parties agreed that performance under the First Agency Contract was to be controlled by a second agency contract discussed below. *Id.,* Ex. 3.

Under the First Agency Contract, Apollo was to receive $1,995,163 in return for supplying its fuel additives, equipment and technology. *Id.* Payment was to be made directly from NAPOCOR to Apollo.[13] *Id.;* Becker Aff., ¶ 19, Ex. C. As indicated in the Trial Contract, forty percent would be paid at the time of shipment of the additives and equipment to NAPOCOR, with the balance payable if the Trial Program proved successful. Widjaja Aff., Ex. 3; Kukin Aff., ¶ 6. Centrosphere would be paid a fifteen percent commission. *Id.* One hundred twenty one thousand dollars was payable to Centrosphere at the time payment was made by NAPOCOR to Apol-

lo, with the balance payable after final payment was made to Apollo by NAPOCOR. Widjaja Aff., Ex. 3.

The First Agency Contract further provided that Apollo would finance the shipping and insurance costs of additives and equipment to NAPOCOR. *Id.;* Becker Aff., ¶ 19; Kukin Aff., ¶ 6. Apollo also agreed to assume the risk of loss. Becker Aff., ¶ 19; Kukin Aff., ¶ 6. As indicated previously, Centrosphere was to obtain the Letter of Credit from NAPOCOR before 31 January 1991. Widjaja Aff., Ex. 3.

The First Agency Contract contained an addendum (the "First Agency Contract Addendum"). Widjaja Aff., Ex. 3. The First Agency Contract Addendum provided that the First Agency Contract would not be effective without written verification by counsel for both Apollo and Centrosphere that the First Agency Contract "is accepted by both corporations' legal counsel." *Id.;* Kukin Aff., ¶ 5(k). Such confirmation was to be received by 31 January 1991 and, if not received, the First Agency Contract was to be considered binding. Kukin Aff., ¶ 5(k); Widjaja Aff., Ex. 3. According to Apollo, no confirmation on behalf of Apollo or Centrosphere occurred by 31 January 1991 or at any time thereafter. Kukin Aff., ¶ 5(k).

### 2. *The Second Agency Contract*

The second contract signed on 31 December 1990 (the "Second Agency Contract") established the general terms of the agency relationship between Centrosphere and Apollo. Widjaja Aff., Ex. 3. According to Centrosphere, the Second Agency Contract had not been seen or discussed by Centrosphere prior to its presentation. *Id.,* ¶ 17; Opp. Brief at 4. Also according to Centrosphere, Centrosphere signed the Second Agency Contract without reading it and

**11.** It appears that no discussions occurred between the parties on 30 December 1990. Opp. Brief at 4.

**12.** The First Agency Contract, which Centrosphere admits reading and suggesting changes, states that "[o]n behalf of Apollo, its principal,

Centrosphere has obtained a commitment from NAPOCOR for [the Trial Program]." Widjaja Aff., Ex. 3.

**13.** NAPOCOR paid Apollo the entire Purchase Price. Complaint, ¶ 7.

without suggesting any changes.[14] Widjaja Aff., ¶¶ 15, 17; Opp. Brief at 4.

Pursuant to the Second Agency Contract, Centrosphere was appointed as Apollo's agent in the Philippines for the sale of Apollo's products. Complaint, ¶ 9; Becker Aff., ¶ 21; Widjaja Aff., Ex. 3. For its services, Centrosphere was to receive a commission of fifteen percent of Apollo's net receipts from additive sales made during the term of the Second Agency Contract, subject to certain deductions and allowances. Complaint, ¶ 14; Becker Aff., ¶ 28; Widjaja Aff., Ex. 3.

In conjunction with its appointment, Centrosphere was obligated "to devote its best efforts to the promotion of the sale of Apollo's products," "to engage a technical sales executive on a full time basis" and "to supplement its staff with adequate technical service, mechanical service and sales associates to handle the growth of Apollo's business in the Philippines." Becker Aff., ¶ 26 (quoting Ex. A); Complaint, ¶ 13; Widjaja Aff., Ex. 3.

The Second Agency Contract also provided that Centrosphere's personnel were responsible for providing any technical and mechanical services required in the Philippines. Complaint, ¶ 13; Becker Aff., ¶ 26; Widjaja Aff., Ex. 3. Subsequently, Apollo was informed by Centrosphere that Widjaja would serve as Centrosphere's chief technical expert and would supervise the Trial Contract and Centrosphere's performance of its obligations under the Agency Contracts. Becker Aff., ¶ 41; Kukin Aff., ¶ 5(d).

The First Agency Contract specifically obligated Centrosphere to assist Apollo in its efforts to obtain business from NAPOCOR and to provide technical engineers and mechanics to apply Apollo's fuel additives on-site at the Malaya Plant. Complaint, ¶ 15; Becker Aff., ¶ 27; Widjaja Aff., Ex. 3. To enable Centrosphere to fulfill these obligations, the Second Agency Contract provided that Apollo would give Centrosphere access to "customer lists, formulas, processes, data and know-how of Apollo and to confidential business information." Widjaja Aff., Ex. 3; Complaint, ¶ 16; Becker Aff., ¶¶ 24, 27. The Second Agency Contract referred to these items collectively as "company trade secrets." Widjaja Aff., Ex. 3; Complaint, ¶ 16; Becker Aff., ¶¶ 24, 27. Centrosphere agreed in the Second Agency Contract not to disclose any trade secrets provided to it by Apollo without the written consent of Apollo.[15] Widjaja Aff., Ex. 3; Complaint, ¶ 12; Becker Aff., ¶ 24.

Centrosphere also agreed in the Second Agency Contract not to "manufacture or sell" fuel additives, equipment, feeding systems or any other products or services competitive with Apollo's products in the Philippines. Widjaja Aff., Ex. 3; Complaint, ¶ 11; Becker Aff., ¶ 23. This noncompete clause was to last for the term of the Second Agency Contract and for a period of three years after its termination. Widjaja Aff., Ex. 3; Becker Aff., ¶ 23; Kukin Aff., ¶ 5(m).

The Second Agency Contract was expressly limited to a term of one year unless Centrosphere was able to obtain a "long term commitment" from a Philippine client within that time (the "Expiration Clause"). Widjaja Aff., Ex. 3; Opp. Brief at 5; Becker Aff., ¶ 22; Kukin Aff., ¶ 5(l). In the case of a long term commitment, the Second Agency Contract would be "extended for a minimum of two years and thereafter either party [would] be able to terminate on

---

**14.** Centrosphere asserts that it did not read the Second Agency Contract because of time constraints. Widjaja Aff., ¶¶ 15–16. Centrosphere contends it "was anxious to consummate a deal, fearing that Centrosphere might default on its contract with NAPOCOR which, by its terms, was supposed to commence on December 20th...." Opp. Brief at 5. Centrosphere also indicates that its personnel were anxious to return to the Philippines for the remainder of the Christmas holiday. *Id.* The Second Agency Contract is only two and one-half pages long. *See* Widjaja Aff., Ex. 3.

**15.** Apollo states that this confidentiality agreement was "integral to Apollo's decision both to allow Centrosphere to serve as its agent in the sale of its products, and to give it access to confidential information concerning the fuel additive business." Becker Aff., ¶ 25.

six months notice." Widjaja Aff., Ex. 3; Becker Aff., ¶ 22.

Finally, the Second Agency Contract provided that it was to be governed by "the laws of the State of New York, U.S.A." and that "any breach of [the Second Agency Contract] shall entitle Apollo, in addition to any other legal remedies available to it, to *apply* to any court of competent jurisdiction to enjoin any violation of this agreement." [16] Widjaja Aff., Ex. 3; Kukin Aff., ¶ 5(m) (emphasis added).

### E. Performance of the Trial Contract

Performance of the Trial Contract was to commence in the two Malaya Plant units on 30 November 1990 and 20 December 1990. Widjaja Aff., ¶ 14 (quoting Trial Contract article II), Ex. 2. After three months, an evaluation was to be made, followed by a determination of whether the test should continue. *Id.*, Ex. 2; Opp. Brief at 5; Becker Aff., Ex. B. It was anticipated that a successful test would lead to a long-term contract with NAPOCOR. Opp. Brief at 5.

Shipment of the fuel additives to the Philippines appears to have been delayed following the award of the Trial Contract. Widjaja Aff., ¶ 19. The parties dispute the extent and cause of this delay. According to Centrosphere, delay was caused because Apollo experienced supply problems and was unable to ship its fuel additives to the Philippines. *Id.*

Apollo's account is different. On 12 December 1990, Apollo informed Centrosphere that it had begun assembling the equipment necessary for the Trial Program, despite the fact that Centrosphere had not yet supplied the Letter of Credit. Kukin Aff., ¶ 5(h); Kukin Exhibits, Ex. 8 (letter from Kukin to Widjaja, dated 19

December 1990 (the "19 December Letter")). The 19 December Letter reiterated that Centrosphere should dispatch an engineer to Apollo's Israel facility to learn about the fuel additives program and how to carry out the tests. Kukin Exhibits, Ex. 8. The 19 December Letter also indicated, however, that demand for Apollo's products and engineers in Eastern Europe had increased significantly and could result in production delays of Apollo's products.[17] *Id.*

As mentioned, from 28 December 1990 to 31 December 1990, the parties met in New Jersey (the "New Jersey Meetings") to discuss the Trial Contract and to formalize the relationship between Apollo and Centrosphere. *See supra* at pp. 1171–1172. The Agency Contracts were signed during these meetings. *See id.* Although Centrosphere agreed to provide Apollo with the Letter of Credit by 31 January 1991, Widjaja Aff., Ex. 3; Kukin Aff., ¶ 6, on 24 January 1991 the parties signed a "Letter of Understanding" providing that Centrosphere would arrange for Apollo to receive the Letter of Credit from NAPOCOR by 15 February 1991. Kukin Aff., ¶ 7; Kukin Exhibits, Ex. 10.

In February 1991, Apollo asserts it delivered twenty-one container loads of equipment and chemicals to the dockside in Newark, New Jersey, pending receipt of the Letter of Credit. Kukin Aff., ¶ 8. Although the Letter of Credit did not arrive, Apollo nevertheless shipped the twenty-one containers from Newark to the Philippines on 15 March 1991. *Id.;* Kukin Exhibits, Ex. 11 (bills of lading, dated 15 March 1991, for the twenty-one container shipment). An additional seven containers of chemicals were shipped from Newark to the Philippines on 20 April 1991. Kukin Aff., ¶ 8;

---

**16.** Based on this language, Apollo argues: "Our contract with Centrosphere expressly provided for injunctive relief in case of such violation." Kukin Aff., ¶ 4. This is not true. The right to "apply" for an injunction does not entitle Apollo to the "granting of an injunction."

**17.** Specifically, the 19 December Letter states:
We have suddenly become confronted with the necessity of manufacturing Apollo injection systems for Poland and Greece in addi-

tion to our normal requirements. Unfortunately, it is impossible for us to gear up our equipment manufacturing facilities fast enough to handle all these requirements. We are indeed starting to do this but it will take between four to six months for us to reach anywhere the capacity that will be required. In addition, we shall be extremely hard pressed to provide engineers and technicians to handle the test programs.
Kukin Exhibits, Ex. 8.

Kukin Exhibits, Ex. 11 (bill of lading, dated 20 April 1991, for the seven container shipments). The Letter of Credit from NAPOCOR was received on 17 May 1991. Kukin Aff., ¶ 8; Becker Aff., Ex. C (Letter of Credit, dated 17 May 1991 from NAPOCOR to Apollo).

Further delay in the tests at the Malaya Plant was caused when hearings were initiated before the Philippines Securities and Exchange Commission by a bidder who had lost the Trial Contract. Widjaja Aff., ¶ 20; Opp. Brief at 6; Kukin Aff., ¶ 10. The tests actually began in September 1991 and the Trial Contract was performed from September 1991 to 28 February 1992. Complaint, ¶ 21; Widjaja Aff., ¶ 21.

According to Apollo, Centrosphere neither sent engineering personnel to be trained by Apollo nor provided sufficient personnel to the Malaya Plant to oversee and operate the Trial Program.[18] Kukin Aff., ¶¶ 5, 10. Widjaja, who was supposed to supervise the Trial Program, apparently did not go to the Philippines despite being notified that the shipments of materials had commenced.[19] *Id.* ¶ 9; Kukin Exhibits, Ex. 13 (letter from Kukin to Mercado–DeLeon, dated 6 June 1991). As a result, Apollo sent its own engineering personnel to the Malaya Plant to install the equipment, supervise the injection of additives, oversee the Trial Program and train and supervise local personnel. Kukin Aff., ¶ 10.

On 29 October 1991, Apollo prepared a report on the preliminary results of the Trial Program. *Id.,* ¶ 11. This report was sent by Apollo to Centrosphere for delivery to NAPOCOR. *Id.;* Kukin Exhibits, Ex. 15

(letter from Becker to Mercado–DeLeon, dated 29 October 1991).

**F. Completion of the Trial Contract**

Upon completion of the first three months of the Trial Contract, NAPOCOR determined that the Trial Program had been a success. Widjaja Aff., ¶ 22, 25; Complaint, ¶ 21; Becker Aff., ¶ 44, Ex. K (memorandum from Jose T. Ramos ("Ramos") to National Power Board, Quazon City, the Philippines, dated 20 January 1992). A meeting among Apollo, Centrosphere and NAPOCOR officials occurred in the Philippines on either 17 or 20 January 1992.[20] Becker Aff., ¶ 45; Widjaja Aff., ¶¶ 23–24. Although Apollo states that it requested this meeting, Centrosphere appears to have made the necessary arrangements with NAPOCOR. Widjaja Aff., ¶¶ 23–24, Ex. 4 (letter from Mercado–DeLeon to Pablo V. Malixi ("Malixi"), dated 26 December 1991); Kukin Aff., ¶ 11. The purpose of this meeting was to review the first three months of the Trial Program and make recommendations to conduct the final month of testing. Widjaja Aff., ¶¶ 23–24, Ex. 4; Opp. Brief at 5–6. Centrosphere asserts that it paid for Apollo's expenses arising from the visit, Widjaja Aff., ¶ 24; Opp. Brief at 6, while Apollo asserts that it paid for its own expenses. Kukin Aff., ¶ 13. The Apollo officials in attendance were Kukin and Becker. *Id.;* Widjaja Aff., ¶ 24.

At this meeting, Apollo asserts NAPOCOR agreed to place an order for an additional one month supply of fuel additives. Becker Aff., ¶ 45; Kukin Aff., ¶ 13. Al-

---

**18.** Apollo also asserts that Centrosphere failed to provide the financial support for the Trial Program which it was obligated to do under the Agency Agreements. Kukin Aff, ¶ 9; Kukin Exhibits, Ex. 13. Thus, on 15 September 1991, Apollo loaned Centrosphere seventy-five thousand dollars. Kukin Exhibits, Ex. 14 (Promissory Note from Centrosphere to Apollo, dated 15 September 1991).

**19.** Apollo asserts that Widjaja refused to go the Philippines because Widjaja and his former companies, London and East/West, had been blacklisted from doing business with NAPOCOR and Widjaja was afraid of prosecution. Becker Aff., ¶ 42; Kukin Aff., ¶ 9; Pepe Aff., ¶ 2. Wid-

jaja denies these companies were ever the subject of a governmental investigation or were ever blacklisted. Widjaja Aff., ¶ 5 n. 1. Nevertheless, in July 1992, it appears that NAPOCOR became aware of Widjaja's connection with London and East/West and objected to Widjaja working at the Malay Plant. Becker Aff., ¶¶ 42–43, Ex. J (letter from J.C. Quadarrama to J. Samonte, Esq., dated 14 July 1992).

**20.** The Becker Aff. indicates the meeting occurred on 20 January 1992, while the Kukin Aff. indicates that the meeting occurred on 17 January 1992. Becker Aff., ¶ 45; Kukin Aff., ¶ 13.

though this extension is confirmed by a letter from NAPOCOR to Apollo, dated 22 January 1992, Kukin Exhibits, Ex. 16, Centrosphere asserts that NAPOCOR had reservations about cost projections and wanted to enter into another four month trial period. Widjaja Aff., ¶ 25. On 10 February 1992, NAPOCOR did place an order for an additional four month trial supply of fuel additives for the Malaya Plant (the "Second Trial Order"). Becker Aff., ¶ 45; Widjaja Aff., ¶ 26. For these additional goods, NAPOCOR paid Apollo one million seven hundred fifty thousand dollars. Complaint, ¶ 21; Becker Aff., ¶ 45.

Apollo alleges the Second Trial Order was placed directly with Apollo and did not involve the services of Centrosphere. Becker Aff., ¶ 45. In contrast, Centrosphere contends that it was Centrosphere who notified Apollo of the Second Trial Order.[21] Widjaja Aff., ¶ 26, Ex. 5. In support of this claim, Centrosphere submitted a letter, dated 23 January 1992, from Centrosphere to Apollo which states: "We are now working on the contract for the repeat order and expect [NAPOCOR] to negotiate for a reduced price...." *Id.* (letter from Medina to Kukin, dated 23 January 1992).

## G. Relationship Between Apollo and Centrosphere After 1 January 1992

Prior to 1 January 1992, neither NAPOCOR nor any other Philippine customer made a long term commitment to purchase fuel additives from Apollo. Complaint, ¶ 19; Becker Aff., ¶¶ 29–31; Kukin Aff., ¶ 5(*l*). As a result, Apollo alleges the Second Agency contract expired by its own terms on 31 December 1991.[22] Complaint, ¶¶ 19, 38, 44; Becker Aff., ¶¶ 3, 31. In May or June 1992, Apollo paid Centrosphere all

sums due Centrosphere under the Agency Contracts, despite its claim that Centrosphere failed to provide the technical support staff and financial backing required by the Agency Contracts. Complaint, ¶¶ 32, 46; Becker Aff., ¶¶ 33, 35.

Apollo alleges that at no time did it agree to extend the agency relationship with Centrosphere beyond 31 December 1991. Becker Aff., ¶¶ 33, 40. On numerous occasions, it appears that Apollo expressly notified Centrosphere that Centrosphere's authority to act as Apollo's agent had terminated as of 31 December 1991. *Id.*, ¶ 3; Complaint, ¶¶ 20, 45. These notices appear to have occurred (1) by letter in January 1992, *see* Becker Aff., ¶ 32, Ex. E. (letter from Becker to Juan Medina, dated 24 January 1992), (2) by telephone conversation on 7 February 1992, *see id.*, ¶ 32, Ex. F (Affidavit of Kukin, sworn to 30 August 1992) and (3) by letter in July 1992, *see id.*, ¶ 32, Ex. G (letter from Kukin to Widjaja, dated 7 July 1992).

Despite the alleged expiration of the Second Agency Contract, Apollo and Centrosphere entered into discussions regarding the future of their relationship. *Id.*, ¶ 35; Kukin Aff., ¶ 14. In early February 1992, Apollo appears to have made two proposals to Centrosphere shareholders. Becker Aff., ¶ 35. First, Apollo offered to continue the agency relationship provided that Centrosphere share the cost of building facilities in the Philippines to manufacture the fuel additives to be sold to NAPOCOR (the "Continuance Option"). *id.*, ¶ 35; Kukin Aff., ¶ 14. Apollo conditioned the Continuance Option on the ability of Centrosphere to provide the technical support staff and financial backing it had allegedly

---

**21.** Centrosphere asserts that, during this visit to the Philippines, Apollo began negotiating directly with NAPOCOR for a long term contract. Opp. Brief at 6. Centrosphere states that, during this visit, Apollo granted Mercado–DeLeon a Power of Attorney to be Apollo's "true and lawful attorney and ... sole representative ... in the Philippines." Widjaja Aff., ¶ 28 (quoting Ex. 6 (copy of Power of Attorney)). This Power of Attorney went into effect on 10 February 1992. Widjaja Aff., ¶ 28.

**22.** Centrosphere takes the position that the agency relationship could not expire on 31 December 1991 because (1) the Trial Contract was not scheduled to be completed until February 1992 and (2) Apollo was aware that NAPOCOR would not enter into a long term contract until the Trial Program was complete. Opp. Brief at 5–6.

failed to provide during the Trial Contract. Becker Aff., ¶ 35; Kukin Aff., ¶ 14.

In the alternative, Apollo offered to finance the buy-out of Centrosphere's shareholders by Mercado–DeLeon (the "Stock Purchase Option").[23] Becker Aff., ¶ 36. Mercado–DeLeon was and is the owner of twenty-seven percent of Centrosphere's outstanding stock. *Id.*, ¶ 36. As part of the Stock Purchase Option, Apollo also offered to provide the Centrosphere shareholders with one year consulting agreements pursuant to which they would be paid an amount equal to five percent of the amounts realized on sales of additives to NAPOCOR during that year. *Id.*, ¶ 36. Collectively, Centrosphere's shareholders would have received approximately four hundred fifty thousand dollars from these consulting agreements. *Id.*

On 24 January 1992, Centrosphere indicated to Apollo that "[s]tockholders prefer total buy-out rather than joint venture scheme. Asking price is $2.5 Million Dollar[s]." Kukin Exhibits, Ex. 17 (letter from Medina to Kukin, dated 24 January 1992). By a facsimile, dated the same day, 24 January 1992, Apollo rejected Centrosphere's buy-out offer. Becker Aff., Ex. E; Kukin Aff., ¶ 15. Apparently, negotiations continued and a lower buy-out price was accepted. Kukin Aff., ¶ 15.

On 19 February 1992, six of Centrosphere's shareholders, including Mercado–DeLeon as purchaser, approved the Stock Purchase Option over the Continuance Option and executed agreements to sell their stock to Mercado–DeLeon. Becker Aff., ¶ 37. These six shareholders together held eighty-five percent of Centrosphere's outstanding stock. *Id.* Nevertheless, the Stock Purchase Plan was never implemented. *Id.* In May or June 1992, the deal fell through when one of Centrosphere's stockholders, Bermudez, decided not to sell the remaining fifteen percent interest in Centrosphere to Apollo.[24] *Id.*, ¶¶ 37, 50; Kukin Aff., ¶ 17.

On 20 February 1992, Centrosphere withdrew from participation in the Trial Program. Kukin Aff., ¶ 16. Centrosphere notified Apollo that Centrosphere was "terminating its contractual obligations under the [T]rial [P]rogram effective February 27, 1992 due to the [Trial Program's] completion." *Id.* (quoting Becker Aff., Ex. I (letter from Medina to Kukin, dated 20 February 1992)). By the same letter, Centrosphere notified Apollo that it was terminating the employees who served as technical support staff at the Malaya Plant. Becker Aff., ¶ 38, Ex. I. Centrosphere took this action even though NAPOCOR had already committed to purchase an additional four months of fuel additives and related services. *Id.*, ¶ 38. Centrosphere did not consult Apollo in deciding to terminate those employees. *Id.*

From this point forward, Apollo states it took over responsibility for "the continuing trials" at the Malay Plant and assumed the salaries of the employees who continued on the project. *Id.*, ¶ 60; Kukin Aff., ¶ 16. Moreover, Apollo employed two Centrosphere employees as independent consultants to assist Apollo in dealing with NAPOCOR. Becker Aff., ¶ 60. These employ-

---

23. The Becker Aff. submitted with the Moving Brief characterizes this buy-out proposal as a second option offered by Apollo to Centrosphere. Becker Aff., ¶ 36. The Moving Brief states: "Alternatively, in recognition of their past efforts and particularly, bringing NAPOCOR's bid to Apollo, Apollo offered to finance the buy-out of Centrosphere's shareholders by [Mercado]–DeLeon." *Id.* In contrast, the Kukin Aff. submitted with the Reply Brief characterizes the buy-out as a "demand" by Centrosphere for a buy-out at an "unconscionable and ill-advised price." Kukin Aff., ¶ 15.

24. Centrosphere takes the position that, prior to February 1992 and until her termination by Centrosphere, Mercado–DeLeon had been violating her fiduciary duty to Centrosphere by assisting Apollo in its attempt to secure contracts with NAPOCOR and other entities in the Philippines. Widjaja Aff., ¶ 29. Centrosphere points to the Power of Attorney granted by Apollo to Mercado–DeLeon as evidence of this claim. Widjaja Aff., ¶ 28; *see supra* n. 21. On 21 July 1992, Centrosphere filed a complaint against Mercado–DeLeon and Depano before the Philippines Securities and Exchange Commission alleging fraud and seeking an account-

ees were Mercado–DeLeon and Depano.[25] *Id.*

## H. Recent Dealings Between Apollo and NAPOCOR

In March 1992, Apollo officials met with Ramos, Senior Vice President of Operations of NAPOCOR, in a continuation of Apollo's efforts to receive a long term commitment from NAPOCOR. Becker Aff., ¶ 46; Complaint, ¶ 22. This meeting occurred at Apollo's offices in New Jersey. Becker Aff., ¶ 46.

On 15 June 1992, Apollo officials met again with Ramos, this time in the Philippines. *Id.*, ¶ 47. The parties negotiated a one year contract (the "New Contract") calling for Apollo to supply fuel additives and injection equipment for the Malaya plant and for NAPOCOR's Bataan power plant (the "Bataan Plant"). *Id.*, ¶ 47, Ex. M (letter of agreement, dated 16 June 1992); Complaint, ¶ 22. The value of the New Contract to Apollo is approximately six million five hundred thousand dollars. *Id.;* Becker Aff., ¶ 47. Although NAPOCOR's president has submitted a proposal in favor of the New Contract, the NAPOCOR Board of Directors has not yet approved the New Contract. Becker Aff., ¶¶ 48–49; Kukin Aff., ¶ 16; Kukin Exhibits, Ex. 19 (memorandum from Malixi to NAPOCOR board of directors, dated 18 June 1992). Thus, the New Contract has not yet become binding. Becker Aff., ¶¶ 48–49; Complaint, ¶ 22.

In July 1992, pending approval of the New Contract, NAPOCOR tentatively agreed to purchase an additional four month supply of the fuel additives from Apollo for seven hundred seventy thousand dollars. Becker Aff., ¶ 49, Ex. N. (letter of intent, dated 30 July 1992); Complaint, ¶ 23. This transaction has not yet been consummated. Becker Aff., ¶ 49; Complaint, ¶ 23. NAPOCOR's current supply of fuel additives will be exhausted in late September 1992. Becker Aff., ¶¶ 7, 59. Apollo's efforts to obtain a long-term commitment from NAPOCOR continue. Complaint, ¶ 24.

## I. Recent Actions By Centrosphere

On 22 June 1992, Bermudez of Centrosphere wrote to NAPOCOR requesting that the Second Trial Order be placed with Centrosphere rather than directly with Apollo. Kukin Aff., ¶ 17; Becker Aff., ¶ 50, Ex. O (letter from Bermudez to Malixi, dated 22 June 1992 (the "22 June Letter")). The 22 June Letter states:

> We appreciate your continuing confidence in the products by re-ordering the fuel additives for another 4 months.... We regret that the order was directly awarded to our principal [Apollo] and the price reduction that would have benefitted [NAPOCOR] are not realized.... We have agreed with our principal [Apollo] that prices for on going treatment must be reduced by not less than 25% on top of the 5.31% already given.... For our mutual benefit, may we request that transaction involving our principal [Apollo] be coursed through our company. We are in a better position to serve you better whether in price or service.

Becker Aff., Ex. O. According to Apollo, copies of the 22 June Letter were sent to a Philippines senator and other Philippines government officials. Kukin Aff., ¶ 17.

On 22 June 1992, Apollo became aware of the Centrosphere offer to NAPOCOR. Apollo alleges this offer was made without the authorization of or prior notice to Apollo. Becker Aff., ¶¶ 50–51; Complaint, ¶ 25. On 6 July 1992, Apollo notified NAPOCOR that Centrosphere had no power to act on its behalf because the Second Agency Contract had expired on 31 December 1991. Kukin Aff., ¶ 18; Becker Aff., ¶ 51, Ex. P (letter from Becker to Malixi, dated 6 July 1992); Complaint, ¶ 26. On 7 July 1992, Apollo sent a similar letter to Centrosphere. Kukin Aff., ¶ 18; Becker Aff., ¶ 51, Ex. P (letter from Kukin to Widjaja, dated 7 July 1992).

ing. Widjaja Aff., ¶ 30, Ex. 7 (copy of complaint); Opp. Brief at 7.

---

**25.** Depano was the technical manager and a five percent shareholder of Centrosphere. Becker Aff., ¶ 60.

Also on 7 July 1992, Apollo sent Centrosphere a check for two hundred three thousand one hundred fifty-eight dollars "representing full and final payment for any obligations" owed by Apollo to Centrosphere. Kukin Aff., ¶ 18; Kukin Exhibits, Ex. 21 (letter from Becker to Widjaja, dated 7 July 1992, with attached check). This check was apparently accepted and cashed by Centrosphere. Kukin Aff., ¶ 18.

On 10 July 1992, Centrosphere again offered to fill the Second Trial Order at an additional discount of twenty-five percent. Kukin Aff., ¶ 19; Becker Aff., ¶ 52, Ex. Q (letter from Bermudez to Malixi, dated 10 July 1992). Centrosphere recognized that its prior letter had "triggered an unfavorable reaction from Apollo such that [the Second Agency Contract] was suddenly and unjustifiably revoked." Becker Aff., Ex. Q. Nevertheless, Centrosphere stated that it was "capable of supplying the same fuel additive of the same specifications" as Apollo, even though "the additive will not come from Apollo but direct from our manufacturer under the supervision of Dr. Alfred E. Kober." [26] *Id.;* Complaint, ¶ 27. In a follow-up letter to NAPOCOR, Centrosphere again stated that it would "use the same fuel additives of the same specifications with no deviation from the original formulation ... used in the [T]rial [P]rogram." [27] Becker Aff., ¶ 52, Ex. R (letter from Bermudez to Malixi, dated 15 July 1992) (emphasis removed).

On 11 August 1992, NAPOCOR offered to purchase additives from Centrosphere on a trial basis for use in its Sucat power plant (the "Sucat Plant"). Becker Aff., ¶ 58, Ex. S (letter from Malixi to Bermudez, dated 11 August 1992); Kukin Aff., ¶ 21. The price of this purchase appears to have been seven hundred ten thousand dollars.

Becker Aff., Ex. S. On 20 August 1992, Centrosphere agreed to supply the Sucat Plant with the additive ordered by NAPOCOR. *Id.,* ¶ 58, Ex. T (letter from Bermudez to Malixi, dated 20 August 1992). At this time, Centrosphere again requested that NAPOCOR award Centrosphere with the Second Trial Order. for the Malaya Plant. *Id.*

Finally, in late August or early September 1992, Becker of Apollo met with NAPOCOR in the Philippines. Kukin Aff., ¶ 24; Becker Reply Aff., ¶ 2. According to Apollo, NAPOCOR officials told Becker that NAPOCOR feels threatened by Centrosphere because Centrosphere copies its communications to NAPOCOR to government officials. Kukin Aff., ¶ 21; Becker Reply Aff., ¶ 2. For this reason, Apollo asserts, NAPOCOR is hesitant to deal with Apollo. Kukin Aff., ¶ 21; Becker Reply Aff., ¶ 2. On 7 September 1992, a meeting was arranged between Apollo and Centrosphere at NAPOCOR's offices. Kukin Aff., ¶ 21; Becker Reply Aff., ¶ 2. It appears Becker attended this meeting for Apollo but Centrosphere failed to send a representative. Kukin Aff., ¶ 21; Becker Reply Aff., ¶ 2.

## J. The Complaint

On 10 September 1992, Apollo served Centrosphere with a summons and the Complaint in this action. Widjaja Aff., ¶ 3. Service was made of Widjaja at his residence in Diamond Bar, California, at approximately 7:30 a.m. Widjaja Aff., ¶ 3. According to Centrosphere, the process server was dressed in civilian clothes and did not identify himself as a United States Marshal.[28] Widjaja Aff., ¶ 3; Opp. Brief at 7.

---

**26.** Since the Centrosphere letter of 10 July 1992, Kober has declined to participate in the Centrosphere's manufacture of fuel additives. Becker Aff., ¶ 52 n. 4; Kukin Aff., ¶ 20; Kukin Exhibits, Ex. 22 (letter from Kober to Malixi, dated 22 July 1992).

**27.** Centrosphere asserts it had initiated a search for alternative manufacturers of fuel additives and related technology, including Premier Chemical in New Jersey and Martin Marietta Magnesia Specialties ("Martin Marietta") in Ma-

ryland. Widjaja Aff., ¶ 31. On 23 July 1992, Martin Marietta expressed an interest in supplying Centrosphere with the necessary chemicals but revoked this intention on 4 August 1992. *Id.,* Exs. 8–9.

**28.** Service on Centrosphere was effected by Barristers Attorney Service ("Barristers"), pursuant to its appointment on 10 September 1992 by the deputy of this court. Kukin Exhibits, Ex. 9; Reply Brief at 4.

The Complaint alleges claims for breach of contract, breach of fiduciary duty, unfair competition and intentional interference with a prospective contractual relation. Complaint, ¶ 33–60.

Apollo alleges that Centrosphere has breached the noncompetition provision of the Second Agency Contract. Complaint, ¶ 34. The Complaint states: "Centrosphere, since on or about June, 1992, has entered into direct competition with Apollo for NAPOCOR's business, offering, *inter alia*, to sell NAPOCOR 'the same fuel additives of the same specifications with no deviation from the original formulation of additives' previously supplied by Apollo." Complaint, ¶ 27.

This competition, in turn, has allegedly caused Centrosphere to breach the confidentiality clause of the Second Agency Contract and to violate the fiduciary duties it owed to Apollo as Apollo's agent. Complaint, ¶¶ 28, 34, 37–40. The Complaint states:

> In attempting to compete with Apollo for NAPOCOR's business, Centrosphere is unfairly aided by, and is utilizing and disclosing, the confidential business information and trade secrets [29] it had access to as a result of its fiduciary relationship with Apollo. In addition, Centrosphere has improperly relied directly on the success and goodwill Apollo and its products achieved in the four month trial at [the Malaya Plant].

Complaint, ¶ 28. Apollo alleges Centrosphere has also breached its fiduciary duties by (1) retaining Widjaja, a former principal in two companies blacklisted by NAPOCOR, (2) failing to apprise Apollo of Widjaja's past employment, (3) offering to sell Apollo products without authorization and at unauthorized prices, (4) failing to send technical personnel for training prior to commencement of the Trial Program, (5) requiring Apollo to provide the technical services which Centrosphere was obligated to supply under the Agency Contracts, (6) failing to meet its financial commitments under the agreement and (7) purporting to act as Apollo's agent after the termination of the Second Agency Contract. Complaint, ¶¶ 46–47.

Apollo further alleges that Centrosphere has engaged in practices that constitute unfair competition by utilizing trade secrets and confidential information of Apollo. Complaint, ¶ 51. The Complaint states:

> 52. [Centrosphere] has and continues to utilize these trade secrets and confidential information to aid it in competing with Apollo in the sale of products to NAPOCOR.
>
> 53. In addition, [Centrosphere] has wrongfully and improperly informed NAPOCOR that it could supply it with goods identical to those previously supplied by Apollo.
>
> 54. By these actions, [Centrosphere] is engaging in prohibited unfair competition.

Complaint, ¶¶ 52–54 (paragraph numbers omitted).

Finally, Apollo alleges that Centrosphere has "unjustifiably, intentionally and wrongfully interfered with Apollo's prospective business relations with NAPOCOR." Apollo asserts that, as a result of Centrosphere's unauthorized offers to NAPOCOR to sell Apollo products at unauthorized prices, NAPOCOR has "postponed ratification of the one year contract with Apollo, as well as the two month order for such additives it had tentatively agreed to make." Complaint, ¶¶ 29, 58. More generally, the Complaint states:

> Centrosphere's improper actions threaten to cause Apollo … to lose millions of

---

**29.** Specifically, these trade secret and confidential information included:

> [T]he appropriate amount and mix of additives to utilize, the appropriate time to initiate and shut down application of the additives, the appropriate manner and feed rates at which to apply these additives, the appropriate locations for the additive injection ports, methods of operating the feed equipment during various boiler operating conditions, the capabilities of Apollo's products, NAPOCOR's needs for fuel additives, methods of flue gas tests and analysis of results (which, in turn, reveal the effectiveness of the products), and the prices both at which Apollo would sell and NAPOCOR would buy such additives, equipment and services.

Complaint, ¶ 16; Becker Aff., ¶¶ 27, 54.

dollars worth of contracts to supply millions of dollars of fuel additives to [the Malaya Plant and] to lose the ability to supply millions of dollars of fuel additives to NAPOCOR's three other oil fired facilities as well. Centrosphere's actions also threaten Apollo's efforts to supply other technologies (which achieve similar objectives) to the NAPOCOR's coal powered plant.

Complaint, ¶ 31.

As described above, Apollo asks for preliminary and permanent injunctive relief on all of these claims. Complaint, ¶¶ 36, 42, 49, 56, 60. Despite its claim that Centrosphere's actions "threaten Apollo with ... the loss of millions of dollars of business from NAPOCOR," Apollo claims its potential harm is irreparable and it has no adequate remedy at law. Complaint, ¶¶ 35, 41, 48, 55, 59.

*Discussion*

A. Personal Jurisdiction [30]

Centrosphere argues that personal jurisdiction over it is lacking in this forum. Opp. Brief at 8–11. Centrosphere contends it has no contacts with New Jersey and the dispute arises out of a contract that was to be performed in the Philippines and governed by New York law. *Id.* at 8, 10–11. Centrosphere also argues that Apollo has failed to properly serve process upon it. It argues, therefore, this court lacks personal jurisdiction. *Id.* at 8–10. According to Centrosphere, neither Fed.R.Civ.P. 4 nor the New Jersey long-arm rule (the "Long Arm Rule"), N.J. Court Rule 4:4–4 provide for personal service to an officer of a foreign corporation where that officer is not located within the New Jersey. *Id.*

1. *Jurisdiction Pursuant to the New Jersey Long Arm Rule*

■ A federal court has jurisdiction over a non-resident defendant to the extent authorized by the law of the state in which that court sits. Fed.R.Civ.P. 4(e); *North Penn Gas Co. v. Corning Natural Gas Corp.*, 897 F.2d 687, 689 (3d Cir.), *cert.*

denied, —— U.S. ——, 111 S.Ct. 133, 112 L.Ed.2d 101 (1990); *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 436 (3d Cir.1987); *American Tel. & Tel. Co. v. MCI Communications Corp.*, 736 F.Supp. 1294, 1301 (D.N.J.1990) (hereinafter "*AT & T*"). Federal courts sitting in New Jersey apply New Jersey law when interpreting the meaning of due process for the purpose of *in personam* jurisdiction. *AT & T*, 736 F.Supp. at 1301; *Eason v. Linden Avionics, Inc.*, 706 F.Supp. 311, 319 (D.N.J.1989); *Western Union Telegraph v. T.S.I., Ltd.*, 545 F.Supp. 329, 332 (D.N.J.1982).

■ The Long Arm Rule permits the assertion of *personam* jurisdiction as far as is constitutionally permissible under the Fourteenth Amendment. N.J. Court Rule 4:4–4; *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 284 (3d Cir.), *cert. denied*, 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981); *Charles Gendler & Co. v. Telecom Equip. Corp.*, 102 N.J. 460, 469, 508 A.2d 1127 (1986) (citing *Avdel Corp. v. Mecure*, 58 N.J. 264, 268, 277 A.2d 207 (1971). Under the Fourteenth Amendment, personal jurisdiction exists where the plaintiff demonstrates the defendant has sufficient "minimum contacts" with the forum state:

The first step in a minimum contacts analysis ... is to determine whether the defendant has sufficient contacts with the forum state. The second step is to evaluate those contacts "in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' "

*Charles Gendler & Co.*, 102 N.J. at 472, 508 A.2d 1127 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985)); *see also Lebel v. Everglades Marina, Inc.*, 115 N.J. 317, 322, 558 A.2d 1252 (1989); *Ruetgers-Nease Chem. Co. v. Firemen's Ins.*, 236 N.J.Super. 473, 477, 566 A.2d 227 (App.Div. 1989). The courts of New Jersey have exercised *in personam* jurisdiction "wher-

---

**30.** Centrosphere contends this court lacks personal jurisdiction over it. In order to avoid future disputes on this point, this opinion addresses the personal jurisdiction issue at length.

ever possible with a liberal and indulgent view if the facts reasonably support the presence of the flexible concepts of 'fair play and substantial justice.'" *Ketcham v. Charles R. Lister Int'l, Inc.*, 167 N.J.Super. 5, 7, 400 A.2d 487 (App.Div.1979); *J.I. Kislak, Inc. v. Trumbull Shopping Park, Inc.*, 150 N.J.Super. 96, 98, 374 A.2d 1246 (App.Div.1977).

### a. Minimum Contacts

█ Apollo bears the burden of demonstrating that Centrosphere's contacts with New Jersey are sufficient to give the court *in personam* jurisdiction. *North Penn Gas Co.*, 897 F.2d at 690; *Gehling v. St. George's School of Medicine, Ltd.*, 773 F.2d 539, 542 (3d Cir.1985); *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir.1983). "The plaintiff must sustain its burden of proof through 'sworn affidavits or other competent evidence.'" *North Penn Gas Co.*, 897 F.2d at 689 (quoting *Stranahan Gear Co. v. NL Indust.*, 800 F.2d 53, 58 (3d Cir.1986)). In this case, Apollo relies on the fact that Centrosphere came to New Jersey and, while in the state, negotiated and executed the Agency Contracts. Reply Brief at 6. Centrosphere admits all of these contacts. Widjaja Aff., ¶ 15; Opp. Brief 3–5.

█ Apollo must demonstrate that either specific or general jurisdiction exists over Centrosphere. *Provident Nat'l Bank*, 819 F.2d at 437; *Giangola v. Walt Disney World Co.*, 753 F.Supp. 148, 154 (D.N.J.1990). Specific jurisdiction exists when "the cause of action arises from the defendant's forum-related activities." *North Penn Gas*, 897 F.2d at 690; *see also Provident Nat'l Bank*, 819 F.2d at 437; *Giangola*, 753 F.Supp. at 154; *AT & T*, 736 F.Supp. at 1302. Specific jurisdiction is satisfied by a showing of minimum contacts with the state, such that the defendant should reasonably anticipate being haled into court there. *North Penn Gas*, 897 F.2d at 690 (citing *World–Wide Volks-*

*wagen v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)); *Giangola*, 753 F.Supp. at 154–55. General jurisdiction exists where the defendant has continuous and systematic contacts with the state unrelated to the subject matter of the lawsuit. *Provident Nat'l Bank*, 819 F.2d at 437 (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414–16, 104 S.Ct. 1868, 1872–73, 80 L.Ed.2d 404 (1984)); *see also North Penn Gas*, 897 F.2d at 690 n. 2. General jurisdiction requires a plaintiff to show significantly more than mere minimum contacts. *Provident Nat'l Bank*, 819 F.2d at 437 ("contacts to forum must be continuous and substantial"); *see also North Penn Gas*, 897 F.2d at 690 n. 2 (same); *Gehling*, 773 F.2d at 541 (same).

█ For purposes of establishing either general or specific jurisdiction, minimum contacts with a state are shaped by purposeful conduct making it reasonable for the defendant to anticipate being haled into court there.[31] *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 296; *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283, *reh'g denied*, 358 U.S. 858, 79 S.Ct. 10, 3 L.Ed.2d 92 (1958); *North Penn Gas Co.*, 897 F.2d at 690; *Lebel*, 115 N.J. at 323, 558 A.2d 1252. These contacts must have a basis in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws." *Hanson*, 357 U.S. at 253, 78 S.Ct. at 1240; *accord Lebel*, 115 N.J. at 323–24, 558 A.2d 1252. The absence of a "physical presence" in the state is not determinative for jurisdictional purposes. *Burnham v. Superior Court*, 495 U.S. 604, 618, 110 S.Ct. 2105, 2114, 109 L.Ed.2d 631 (1990) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)); *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184; *Charles*

---

**31.** Because Apollo's claims originate from Centrosphere's contacts with this jurisdiction, the focus of this discussion is on the existence of specific jurisdiction over Centrosphere, al-

though the principles of general jurisdiction and requisite minimum contacts are mentioned as well.

*Gendler,* 102 N.J. at 469–70, 508 A.2d 1127 (same).

 In measuring the sufficiency of minimum contacts for *in personam* jurisdiction, a court must focus upon the "relationship among the defendant, the forum and the litigation." [32] *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977)); *Giangola,* 753 F.Supp. at 155. The "purposeful availment" requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another person.'" *Burger King Corp.,* 471 U.S. at 475, 105 S.Ct. at 2183 (citations omitted); *accord Giangola,* 753 F.Supp. at 155; *AT & T,* 736 F.Supp. at 1302–03; *Lebel,* 115 N.J. at 323, 558 A.2d 1252.

*Burger King* indicates when jurisdiction based upon "purposeful availment" is proper.

> Jurisdiction is proper ... where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum state. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation on that forum as well.

*Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84 (citations omitted) (emphasis in original); *accord North Penn Gas,* 897 F.2d at 690; *see also Hanson,* 357 U.S. at 253, 78 S.Ct. at 1239 (by exercising privilege of conducting activities within forum

state, defendant is put on "clear notice" that it is subject to suit there); *Eason,* 706 F.Supp. at 320 (fairness of exercising jurisdiction results from reciprocal relationship between defendant and forum state).

In cases alleging breach of contract, New Jersey courts have held that non-resident defendants not doing business in the state may nonetheless be amenable to suit in New Jersey when they enter contracts which "will have a significant effect in [the] state." *Avdel Corp.,* 58 N.J. at 268, 277 A.2d 207; *accord Bovino,* 221 N.J.Super. at 436, 534 A.2d 1032; *Semcor, Inc. v. Satellite Air Transp. Assoc.,* 201 N.J.Super. 386, 389, 493 A.2d 75 (Law.Div.1985). Similarly, the United States Supreme Court has stated:

> [W]ith respect to interstate contractual obligations ... parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to regulation and sanctions in the other State for the consequences of their actions.

*Burger King,* 471 U.S. at 473, 105 S.Ct. at 2182 (quoting *Travelers Health Ass'n v. Virginia,* 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950).

 In determining "whether and to what extent a contract can constitute a 'contact' for purposes of due process analysis," the Supreme Court has indicated that certain factors are relevant. *Burger King,* 471 U.S. at 478–79, 105 S.Ct. at 2185. These factors include: prior negotiations, contemplated future consequences, terms of the contract and the parties actual course of dealing. *Id.* at 479, 105 S.Ct. at 2185.

When the balance of these factors point to the forum state, courts have found purposeful availment by and personal jurisdiction over the non-resident defendant. *See Complete Concepts, Ltd. v. General*

---

**32.** In establishing specific jurisdiction, an isolated act may be sufficient to subject the defendant to the jurisdiction of the forum. *Charles Gendler,* 102 N.J. at 471, 508 A.2d 1127 (citing *McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 200, 2 L.Ed.2d 223 (1957);

*see also DeJames,* 654 F.2d at 286; *Western Union,* 545 F.Supp. at 333; *Bovino v. Brumbaugh,* 221 N.J.Super. 432, 435–36, 534 A.2d 1032 (App.Div.1987); *Dave's Trash Removal v. Charm City Equip. Corp.,* 214 N.J.Super. 497, 501, 520 A.2d 415 (App.Div.1987).

*Handbag Corp.,* 880 F.2d 382, 388–89 (11th Cir.1989); *see, e.g., Entek Corp. v. Southwest Pipe & Supply Co.,* 683 F.Supp. 1092, 1098–99 (N.D.Tex.1988) (minimum contacts established when defendants visited plaintiff's manufacturing plant, signed confidentiality agreements and observed plaintiff's product and processes prior to entering distributor agreement); *New Generation Foods, Inc. v. Spicer's Int'l Common Trust,* 669 F.Supp. 599, 601 (S.D.N.Y.1987) (same, when non-resident defendants visited forum state and negotiated and executed contract from which cause of action arose, even though visit lasted only one day); *Cal Caulfield & Co. v. Colonial Nursing Homes, Inc.,* 642 F.Supp. 777, 780 (D.Kan.1986) (same, when contract was executed by parties in forum state, called for continuing relationship between the parties and called required preparatory performance in forum state, even though purpose of contract was to build nursing home in another state); *Hardin v. DLF Computer Co.,* 617 F.Supp. 70, 72 (W.D.N.C.1985) (same, when contract was executed in forum state and called for plaintiff to ship goods from and receive payment in forum state).

In *Avdel Corporation v. Mecure,* the New Jersey Supreme Court found minimum contacts and purposeful availment on facts similar to the facts of this case. 58 N.J. at 272–73, 277 A.2d 207. In *Avdel,* a non-resident defendant contacted the plaintiff, a New Jersey manufacturer and seller of rivets, expressing interest in the purchase of rivets. *Id.* at 267, 277 A.2d 207. After placing an order with the plaintiff's salesman in New York, the defendant telephoned the plaintiff's New Jersey plant two days later and increased his order of rivets. *Id.* Within a month, the defendant also visited the plaintiff's plant in New Jersey to discuss matters relating to the contract. *Id.* Plaintiff manufactured rivets specially designed for the defendant and, on numerous occasions, the plaintiff's representatives visited the defendant in New York to deliver rivets. *Id.* at 267, 277 A.2d 207. Plaintiff later sued the defendant in New Jersey for an amount due on the contract. *Id.* at 266–67, 277 A.2d 207.

On these facts, the New Jersey Supreme Court held that the "defendant's contacts with this state were sufficient to meet the constitutional requirement of fairness," *id.* at 272, 277 A.2d 207, and stated:

> Defendant ordered rivets from the plaintiff corporation and he knew that his order would have significant effects in New Jersey since it was anticipated that the plaintiff would either manufacture the rivets here or obtain them from some other source.... Moreover, defendant actually entered this state to discuss his contract with the plaintiff. At defendant's request, plaintiff's representatives delivered rivets to defendant's job sites in New York.... [W]e have no difficulty holding defendant amenable to suit in this state since .... he purposely availed himself the opportunity to engage in a commercial transaction involving activities in this state.

*Id.* at 272–73, 277 A.2d 207.

Similarly, in *Western Union Tel. Co. v. T.S.I., Ltd.,* a federal court applying New Jersey law found minimum contacts and purposeful availment where three of the defendant's officers travelled to New Jersey and entered into negotiations leading to the execution of three contracts. 545 F.Supp. at 335. The *Western Union* court also recognized that the defendant had made "numerous telephone and mail contacts" to the plaintiff in New Jersey with respect to the contracts. *Id.* at 335. The *Western Union* court concluded:

> [T]his case is quite unlike *World–Wide Volkswagen* and *Hanson v. Denckla,* in which defendants had only fortuitous, rather than purposeful, contacts with the forum state. The visits and communications in the instant case indicate bilateral, rather than unilateral, contact by the parties with New Jersey.

*Id.; accord Koff v. Brighton Pharmaceutical, Inc.,* 709 F.Supp. 520, 525–27 (D.N.J. 1988); *see also Alchemie Int'l, Inc. v. Metal World, Inc.,* 523 F.Supp. 1039, 1049–52 (D.N.J.1981) (significant telephone and mail contacts with New Jersey plaintiff support jurisdiction over non-resident defendant even without visit to state).

In this case, Centrosphere's contacts with New Jersey are sufficient to establish specific personal jurisdiction.[33] Regardless of when Centrosphere communicated with Apollo, Centrosphere concedes initiating communication with Apollo for its contract with NAPOCOR. Opp. Brief at 3; *see also* Kukin Exhibits, Exs. 1–2. Centrosphere reached into New Jersey to establish a commercial relationship with a New Jersey corporation. *Burger King,* 471 U.S. at 473, 479–80, 105 S.Ct. at 2182, 2185; *Travelers Health Ass'n,* 339 U.S. at 647, 70 S.Ct. at 929; *Avdel,* 58 N.J. at 272–73, 277 A.2d 207.

This relationship, moreover, was a continuing one, rather than a one-time contact. Centrosphere agreed to serve as Apollo's agent for a period of at least one year. Becker Aff., ¶ 20; Widjaja Aff., ¶ 15, Ex. 3 (copies of Agency Contracts). Having come into New Jersey and having established such a relationship with a New Jersey corporation, Centrosphere should have anticipated being haled into the New Jersey courts. *Burger King,* 471 U.S. at 475–76, 479–80, 105 S.Ct. at 2184, 2185–86; *North Penn Gas,* 897 F.2d at 690; *Entek,* 683 F.Supp. at 1098–99; *Cal Caulfield,* 642 F.Supp. at 780.

Officials of Centrosphere travelled to New Jersey to discuss the terms under which Centrosphere would supply Apollo's products to NAPOCOR. Becker Aff., ¶ 20; Widjaja Aff., ¶ 15; Kukin Aff., ¶ 5. This visit lasted four days. Widjaja Aff., ¶ 15; Opp. Brief at 4; Kukin Aff., ¶ 5. During this visit, Centrosphere officials read, negotiated and executed the First Agency Contract and executed the Second Agency Contract while in New Jersey.[34] Widjaja Aff., ¶¶ 15, 17; Opp. Brief at 4; Kukin Aff., ¶ 5. The record also indicates a good deal of correspondence by Centrosphere to Apollo in New Jersey. *See, e.g.,* Widjaja Aff., ¶¶ 23, 26 Ex. 5; Becker Aff., Exs. E, H–I: Kukin Exhibits, Exs. 1–2, 5–6, 10, 12, 14, 17, 20.

Centrosphere's physical presence in New Jersey, its negotiation and execution of contracts within the forum, together with its supporting correspondence to Apollo, speak in favor of personal jurisdiction. *Koff,* 709 F.Supp. at 525–27; *Western Union,* 545 F.Supp. at 335; *Alchemie,* 523 F.Supp. at 1049–52; *Avdel,* 58 N.J. at 272–73, 277 A.2d 207; *see also New Generation Foods,* 669 F.Supp. at 601; *Entek,* 683 F.Supp. at 1098–99; *Hardin,* 617 F.Supp. at 72.

Finally, contrary to Centrosphere's suggestion, performance of the Agency Contracts was not to occur entirely within the Philippines. *See* Opp. Brief at 9. Apollo was required to supply and did supply fuel additives, equipment and intellectual property from New Jersey to the Philippines or to arrange for shipment from some other source. Kukin Aff., ¶ 8. Moreover, pursuant to the First Agency Contract, all payments passed through New Jersey. Payment to Apollo was received in New Jersey directly from NAPOCOR, while both payment and a loan to Centrosphere were

---

**33.** Centrosphere maintains no offices in New Jersey or in the United States. Widjaja Aff., ¶ 4; Opp. Brief at 1–2. Similarly, Centrosphere is not licensed to do business in New Jersey or anywhere else in the United States. Widjaja Aff., ¶ 4; Opp. Brief at 1–2. Because Centrosphere lacks any "continuous and systematic" presence in New Jersey, general jurisdiction does not exist in this action. *Provident Nat'l Bank,* 819 F.2d at 437 (citing *Helicopteros,* 466 U.S. at 414–16, 104 S.Ct. at 1872–73); *see also North Penn Gas,* 897 F.2d at 690, n. 2.

**34.** Centrosphere's suggestion that it was forced to sign these contracts because it sensed "great urgency to consummate an agreement quickly," Opp. brief at 18, and that it never read the Second Agency Contract, Widjaja Aff., ¶¶ 15–16, does not affect the value of these contacts for purposes of determining jurisdiction. Centrosphere concedes it came to New Jersey to negotiate contracts with Apollo and did negotiate at least one contract with Apollo. Widjaja Aff., ¶ 15. By the time Centrosphere left New Jersey, it had voluntarily signed two contracts. *Id.,* ¶ 15, Ex. 3. Whatever sense of "urgency" motivated Centrosphere to sign the Agency Contracts, nothing suggests that Centrosphere was involuntarily forced to sign the Agency Contracts by Apollo. *New Generation,* 669 F.Supp. at 601.

It is difficult to understand why Centrosphere was unable to read the Second Agency Contract prior to its execution. The document is only slightly more than two pages long. Widjaja Aff., Ex. 3.

made by Apollo from New Jersey. Widjaja Aff., Ex. 3; Kukin Aff., ¶ 10. In short, the subject matter of the Agency Contracts and the parties' course of dealing create significant contacts between the parties to the Agency Contracts and New Jersey. Again, these contacts support personal jurisdiction over Centrosphere. *North Penn Gas*, 897 F.2d at 690–91; *Avdel*, 58 N.J. at 272–73, 277 A.2d 207; *Bovino*, 221 N.J.Super. at 436, 534 A.2d 1032; *Semcor*, 201 N.J.Super. at 389, 493 A.2d 75.

Taken together, Centrosphere's contacts with New Jersey arising from the Agency Contracts satisfy the minimum contacts due process requirements of personal jurisdiction. Centrosphere purposefully availed itself of the privilege of conducting business activities in New Jersey when it reached into New Jersey and established a continuing relationship with a New Jersey corporation. This conduct, including Centrosphere's visit to New Jersey, was voluntary and in no way random, fortuitous or attenuated.[35] On the basis of its conduct in and directed toward New Jersey, Centrosphere should have anticipated being haled into a court in New Jersey.

### b. Fair Play and Substantial Justice

■ Once it has been decided that minimum contacts exist, the Supreme Court has established that "these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184 (quoting *International Shoe*, 326 U.S. at 320, 66 S.Ct. at 160); *see also Charles Gendler*, 102 N.J. at 472, 508 A.2d 1127. These factors include: (1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most effi-

cient resolution of the controversies and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* 471 U.S. at 477, 105 S.Ct. at 2184 (quoting *World–Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564); *see also Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987); *Charles Gendler*, 102 N.J. at 472, 508 A.2d 1127.

The Supreme Court has indicated that these considerations may serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. *Id.* (citing *Keeton*, 465 U.S. at 780, 104 S.Ct. at 1481; *Calder v. Jones*, 465 U.S. 783, 788–89, 104 S.Ct. 1482, 1486–87, 79 L.Ed.2d 804 (1984); *McGee*, 355 U.S. at 223–24, 78 S.Ct. at 201). On the other hand, where a defendant with minimum contacts seeks to defeat jurisdiction, the Court has required the defendant to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[36] *Id.; see, e.g., Asahi*, 480 U.S. at 114–16, 107 S.Ct. at 1033–34.

In cases where the interest of the plaintiff and the forum state are minimal, the Supreme Court has indicated that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi*, 480 U.S. at 115, 107 S.Ct. at 1034 (citing *United States v. First Nat'l City Bk.*, 379 U.S. 378, 404, 85 S.Ct. 528, 542, 13 L.Ed.2d 365 (1965) (Harlan, J., dissenting)). Nevertheless, such cases are rare where minimum contacts have been established. *Id.* 480 U.S. at 116, 107 S.Ct. at 1034 (Brennan, J. concurring).

■ In determining the fairness of asserting personal jurisdiction, courts have emphasized that New Jersey has a strong interest in providing a forum for its residents and in enforcing the contractual obli-

---

**35.** Contrary to Centrosphere's assertion, *World–Wide Volkswagen*, 444 U.S. 286, 100 S.Ct. 559, does not control this case and is distinguishable on its facts. *See* Opp. Brief at 10–11.

**36.** The Court has indicated that most considerations can usually be accommodated through means short of finding jurisdiction unconstitutional, such as applying a specific forum's choice of law rules or seeking a change in venue. *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2185.

gations of parties who contract with New Jersey residents.[37] *Koff,* 709 F.Supp. at 528; *CFTC v. American Metal Exch. Corp.,* 693 F.Supp. 168, 188 (D.N.J.1988); *Alchemie,* 523 F.Supp. at 1052; *Lebel,* 115 N.J. at 329, 558 A.2d 1252; *see also Entek,* 683 F.Supp. at 1098–99 (where plaintiff resides in forum, forum state has interest in suit because any recovery by plaintiff benefits forum state). It has also been recognized that New Jersey plaintiffs, like all plaintiffs, have a valid interest in preserving the choice of their home forum.[38] *Koff,* 709 F.Supp. at 528; *American Metal,* 693 F.Supp. at 188; *Charles Gendler,* 102 N.J. at 484, 508 A.2d 1127.

 Centrosphere neither argues nor does it present any facts showing that a finding of jurisdiction in this forum would be unreasonable. Jurisdiction cannot be defeated simply because the nonresident defendant is a foreign entity. *Asahi,* 480 U.S. at 115, 107 S.Ct. at 1033; *Entek,* 683 F.Supp. at 1102–03; *Charles Gendler,* 102 N.J. at 478–80, 483, 508 A.2d 1127. Litigation away from home creates hardship; there "is no constitutional requirement, however, that this hardship must be borne by the plaintiff whenever the defendant is not deemed present in the state of plaintiff's residence." *Alchemie,* 523 F.Supp. at 1052–53.

 It is fair and just for a defendant to be responsible for conduct in a state where its actions have had a detrimental impact. *Burger King,* 471 U.S. at 473–74, 105 S.Ct. at 2182–83; *Semcor,* 201 N.J.Super. at 390–91, 493 A.2d 75. Moreover, "[t]he greater the benefits derived from the defendant's contacts with the forum state, the more reasonable it is to require the defendant to be subject to the jurisdiction of the forum." *Charles Gen-*

*dler,* 102 N.J. at 473, 508 A.2d 1127; *see also Burger King,* 471 U.S. at 473–74, 105 S.Ct. at 2182–83 ("where [defendant] engages in economic activity, it usually will not be unfair to subject [defendant] to the burdens of litigating in another forum for disputes relating to such activity").

 In light of the facts that (1) Apollo has demonstrated the existence of minimal contacts, (2) both New Jersey and Apollo have a substantial interest in allowing this forum to adjudicate this dispute, (3) Centrosphere has not presented a compelling case that jurisdiction is unreasonable, (4) Centrosphere sought to benefit from its contacts with Apollo in New Jersey and (5) Centrosphere's actions may have caused Apollo significant damage, fair play and substantial justice are satisfied by the assertion of specific personal jurisdiction over Centrosphere.

*2. Adequacy of Service of Process*

 Due Process requires "every method of service to provide 'notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 707, 108 S.Ct. 2104, 2112, 100 L.Ed.2d 722 (1987) (quoting *Mullane v. Central Hanover Bk. & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Indeed, before a court exercises personal jurisdiction over a defendant, the procedural requirement of service of a summons must be satisfied. *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 104–05, 108 S.Ct. 404, 409–10, 98 L.Ed.2d 415 (1987); *Hemmerich Indus., Inc. v. Moss Brown & Co.,* 114 F.R.D. 31,

---

**37.** Centrosphere's observation that New York law was chosen by the parties to govern the Agency Contracts does not support its argument. The absence of New Jersey law does not detract from New Jersey's interest in providing Apollo with a forum in which to litigate its breach of contract and other claims against Centrosphere. In contrast, the application of New York law in New Jersey no more burdens Centrosphere than would the application of New York law in the Philippines.

**38.** In contrast, in *Asahi,* the plaintiff was not a resident of the forum state, California. *Asahi,* 480 U.S. at 114, 107 S.Ct. at 1032. Similarly, the state of California had no interest in adjudicating the only issue remaining in the case—the issue of indemnification between Asahi, a Japanese company, and Cheng Shen, a Korean corporation. *Id.*

32 (E.D.Pa.1987); *Electro–Catheter v. Surgical Spec. Instr. Co.*, 587 F.Supp. 1446, 1449 (D.N.J.1984). There must be more than notice to the defendant; there must also be a basis for amenability to service of a summons. *Omni Capital*, 484 U.S. at 104, 108 S.Ct. at 409; *Brink's Mat Ltd. v. Diamond*, 906 F.2d 1519, 1521 (11th Cir. 1990).

Service of process in a federal action is governed by Fed.R.Civ.P. 4. *Omni Capital*, 484 U.S. at 104, 108 S.Ct. at 409; *see also Echevarria–Gonzalez v. Gonzalez–Chapel*, 849 F.2d 24, 28 (1st Cir.1988) (defendant must be served in accordance with Rule 4 for the court to secure personal jurisdiction); *Green v. Humphrey Elevator & Truck Co.*, 816 F.2d 877, 88 (3d Cir.1987) (actual notice is of paramount importance to the scheme contemplated by Rule 4). Rule 4(f) describes where process may be served. Fed.R.Civ.P. 4(f). Rule 4(f) states in pertinent part:

> All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States *or by these rules*, beyond the territorial limits of that state.

*Id.* (emphasis added). As the Supreme Court has indicated, the reference in Rule 4(f) to "these rules" is specifically directed to Fed.R.Civ.P. 4(e). *Omni Capital*, 484 U.S. at 105, 108 S.Ct. at 410.

■ Pursuant to Rule 4(e),[39] a federal court may look to either a federal statute or to the long arm statute of the State in which it sits to determine whether a defendant is amenable to service of process outside of the state. Fed.R.Civ.P. 4(e); *Omni Capital*, 484 U.S. at 105, 108 S.Ct. at 410; *Martin v. Delaware Law School of Widener Univ.*, 625 F.Supp. 1288, 1295 (D.Del. 1985), *aff'd*, 884 F.2d 1384 (3d Cir.), *cert. denied*, 493 U.S. 875, 110 S.Ct. 212, 107 L.Ed.2d 165 (1989); *see also Dent v. Cunningham*, 786 F.2d 173, 175 (3d Cir.1986) ("In the absence of a federal statute authorizing nationwide service of process, federal courts are referred to the statutes or rules of the states in which they sit."); *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 295 (3d Cir.) (same), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985).

■ In this regard, a state long-arm statute is used twice. *Max Daetwyler*, 762 F.2d at 295–96 & n. 7; *Harvey v. Price*, 603 F.Supp. 1205, 1209 (S.D.Ill.1985). First, by determining whether personal jurisdiction exists over the non-resident defendant, the long arm statute determines the amenability of a non-resident defendant to the service of process. *Max Daetwyler*, 762 F.2d at 295–96 & n. 7; *Harvey*, 603 F.Supp. at 1209. Second, the long arm statute then authorizes the method by which service is to take place.[40] *Max Daetwyler*, 762 F.2d at 295–96 & n. 7; *Harvey*, 603 F.Supp. at 1209; *see also Electro–Catheter*, 587 F.Supp. at 1449 (law of forum determines the manner and the extent to which a federal court may assert jurisdiction over a non-resident).

---

**39.** Rule 4(e) states in pertinent part: Whenever a statute of the United States or an order of court thereunder provides for service of a summons, or of notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the manner prescribed by the statute or order, or, if there is no provision therein prescribing the manner of service, in a manner stated in this rule. Whenever a statute or rule of court of the state in which the district court is held provides (1) for service of a summons, or of notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state ... service may ... be made under the circumstances and in the manner prescribed in the statute or rule.

Fed.R.Civ.P. 4(e).

**40.** Under Fed.R.Civ.P. 4(c)(2)(C)(i), a summons and complaint may be served "pursuant to the law of the State in which the District Court is held" if the defendant is an individual or a domestic or foreign corporation. *Id.* Where the state long-arm statute provides personal jurisdiction over the defendant and hence the defendant's amenability to suit in federal court, application of the state service mechanisms is particularly appropriate. *Max Daetwyler*, 762 F.2d at 295–96 & n. 7; *Harvey*, 603 F.Supp. at 1209; *Electro–Catheter*, 587 F.Supp. at 1449, 1456; *see also* C. Wright & A. Miller, *Federal Practice and Procedure*, § 1115 at 244–53, § 1127 at 329.

 As explained above, the Long Arm Rule provides for personal jurisdiction over non-resident defendants "to the uttermost limits provided by the United States Constitution." *Avdel*, 58 N.J. at 268, 277 A.2d 207, *see supra* at p. 1181. As a practical matter, this also means that New Jersey will "allow out-of-state service to the uttermost limits permitted by the United States Constitution." *Avdel*, 58 N.J. at 268, 277 A.2d 207; *see also Dent*, 786 F.2d at 175; Because personal jurisdiction over Centrosphere in New Jersey has already been found, *see supra* at pp. 1181–1187, there is no question Centrosphere was amenable to process issued from New Jersey. *See Electro–Catheter*, 587 F.Supp. at 1455–56.

The question that remains is whether service was properly effected under the Due Process Clause and the Long Arm Rule. As an initial matter, in cases where a foreign corporation is the defendant, the Supreme Court has stated: "Where service on a domestic agent is valid and complete under both state law and the Due Process Clause, our inquiry ends.... [T]he Due Process [C]lause does not require an official transmittal of documents abroad every time there is service on a foreign national." [41] *Volkswagenwerk*, 486 U.S. at 707, 108 S.Ct. at 2112.

Personal service upon an officer of a corporation, including a foreign corporation, constitutes effective service on the corporation itself and satisfies due process.[42] Fed.R.Civ.P. 4(d)(3); *see also United States v. Ayers*, 857 F.2d 881, 888–89 (1st Cir.1988) (service on Panamanian cor-

poration effective when served on corporate officer); *Saez Rivera v. Nissan Mfg. Co.*, 788 F.2d 819, 821 (1st Cir.1986) (service on Japanese corporation proper if served on officer); *United States v. Toyota Motor Corp.*, 561 F.Supp. 354, 361 (C.D.Cal.1983) (process properly served on Japanese corporation by serving its director and president within United States).

The Long Arm Rule provides that process be served

[u]pon a domestic or foreign corporation, by serving, in the manner prescribed in paragraph (a), either an officer, director, trustee, or managing or general agent; or any person authorized by appointment or by law to receive service of process on behalf of the corporation; or the person at the registered office of the corporation in charge thereof.

N.J. Court Rule 4:4–4(c)(1). Paragraph 4(a) of the Long Arm Rule provides that service may occur by personal service or by registered, certified or ordinary mail. *Id.*, 4:4–4(a).

 There is no question Centrosphere was properly served pursuant to the Long Arm Rule. Process was personally served on Widjaja, at his residence in California. Widjaja Aff., ¶ 3. Centrosphere and Widjaja admit Widjaja is the president of Centrosphere. Widjaja Aff., ¶¶ 1, 4. Because Widjaja is an officer of Centrosphere, service on Widjaja constitutes effective service on Centrosphere.

 Centrosphere contends the Long Arm Rule allows for service on a nonresident corporation only by registered

**41.** The Court in *Volkswagenwerk* was specifically discussing the applicability of the Hague Convention Treaty to service made in the United States on the agent of a foreign national. *Volkswagenwerk*, 486 U.S. at 706–07, 108 S.Ct. at 2112. The Court concluded that the Hague Convention Treaty did not apply because no service abroad was required under either the Illinois long arm statute or the Due Process Clause. *Id.* at 707–08, 108 S.Ct. at 2112. Although Centrosphere has not argued that service was improperly served pursuant to the Hague Convention Treaty, such an argument would be ineffective because the *Volkswagenwerk* holding controls the case at bar. As indicated immediately below, service was properly effected within the United States. Because no service abroad was

required, the Hague Convention Treaty is not implicated. *Volkswagenwerk*, 486 U.S. at 707–08, 108 S.Ct. at 2112; *New York Marine Mgrs., Inc. v. M.V. "Topor–1"*, 716 F.Supp. 783, 786 (S.D.N.Y.1989).

**42.** Fed.R.Civ.P. 4(d)(3) provides in pertinent part:

Service shall be made ... [u]pon a domestic or foreign corporation ... by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any agent authorized by appointment or by law to receive service of process....
*Id.*

mail delivered to the foreign corporation's principal place of business. Opp. Brief at 9. This reading is incorrect. The Long Arm Rule specifically states that the procedure suggested by Centrosphere is only available if "personal service cannot be made" upon the corporation directly or its officers. N.J. Court Rule 4:4–4(c)(1); *see also* N.J.Civ.Prac.R. 4:4–4(c) comment 4. Under the Long Arm Rule, as is generally the case, service by mail is a last resort. N.J. Court Rule 4:4–4(c)(1); *see also* N.J.Civ.Prac.R. 4:4–4(c) comment 4; Fed. R.Civ.P. 4(c), (d). The suggestion that mailed service of process is permissible, while personal service is not, is not correct.[43]

No procedural defect occurred in this case. Apollo served Centrosphere in compliance with the manner authorized by both Fed.R.Civ.P. 4 and N.J.Court Rule 4:4–4. This service was reasonably calculated to give Centrosphere notice of this action and an opportunity to respond. As evidenced by Centrosphere's submissions in this case, Apollo's service has achieved both of these ends.

## B. Preliminary Injunction [44]

### 1. *Standard of Review*

In examining requests for preliminary injunctions, federal standards are applied. *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 799 (3d Cir.1989); *System Operations, Inc. v. Scientific Games Dev. Corp.,* 555 F.2d 1131, 1141 (3d Cir.1977). As the Circuit has stated, "although the right upon which this cause of action is based is state created,[45] Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal

---

**43.** Centrosphere also hints that somehow service was inadequate because the process server was not a United States Marshal. Widjaja Aff., ¶ 3; Opp. Brief at 7. This suggestion is baseless. Under Fed.R.Civ.P. 4(c)(1), a United States Marshal is not required to serve a summons and complaint. *Id.* As indicated by Fed.R.Civ.P. 4(c)(2), a summons and complaint may be served "by any person who is not a party and is not less than 18 years of age." *Id.; American Metal Exch.,* 693 F.Supp. at 185.

Under N.J. Court Rule 4:4–3, service of a summons may be made by a sheriff or other officer authorized by the law or by a person specially appointed by the court for that purpose. *Id.* As previously indicted, on 10 September 1992, the deputy of this court appointed Barristers to serve the summons and complaint on Widjaja. Kukin Exhibits, Ex. 9. In accordance with this appointment, Barristers served process on Widjaja on 10 September 1990. *Id.;* Reply Brief at 4.

**44.** Centrosphere has suggested a number of reasons why the preliminary injunction should not issue. In addition to arguing that Apollo has not met the standards required for a preliminary injunction, Opp. Brief at 17–25, Centrosphere also suggests that a preliminary injunction should not be granted where (1) enforcement will prove difficult or impossible, *id.* at 11–12, (2) the affidavits in support of the motion are based on hearsay, *id.* at 13–17, (3) Apollo is guilty of unclean hands, *id.* at 26–27 and (4) Apollo is guilty of laches. *Id.* at 27–28. Because Apollo has failed to satisfy the standards required for the issuance of a preliminary injunction, these arguments are not addressed in this Opinion.

**45.** In a diversity action the federal court is obliged to apply the substantive law of the state in which the forum is located, including that state's choice of law principles. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 187 (3d Cir.1991); *Pancza v. Remco Baby, Inc.,* 761 F.Supp. 1164, 1168 (D.N.J.1991); *Hoffman Equip., Inc. v. Clark Equip., Co.,* 750 F.Supp. 1222, 1229 (D.N.J. 1990), *aff'd,* 935 F.2d 1281 (3d Cir.1991).

Under New Jersey law, choice-of-law provisions are honored as long as fundamental public policies of New Jersey are not offended and the contract bears some relation to the jurisdiction whose law is chosen. *Green Constr. Co. v. First Indem. of Am. Ins. Co.,* 735 F.Supp. 1254, 1259 n. 2 (D.N.J.1990), *aff'd,* 935 F.2d 1281 (3d Cir.1991); *Security Sav. Bk. v. Green Tree Acceptance, Inc.,* 703 F.Supp. 350, 354 (D.N.J.1989) *Kalman Floor Co. v. Jos. L. Muscarelle, Inc.,* 196 N.J.Super. 16, 21–22, 481 A.2d 553 (App.Div. 1984), *aff'd,* 98 N.J. 266, 486 A.2d 334 (1985); *Bell v. Merchants & Businessmen's Mut. Ins. Co.,* 241 N.J.Super. 557, 562, 575 A.2d 878 (App.Div.), *cert. denied,* 122 N.J. 395, 585 A.2d 395 (1990); *McCabe v. Great Pacific Century Corp.,* 222 N.J.Super. 397, 400, 537 A.2d 303 (App.Div. 1990); *Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.,* 208 N.J.Super. 666, 671–73, 506 A.2d 817 (App.Div.1986).

Because the parties chose New York law to apply to the Agency Contracts and because they apply New York law in their submissions, New York law will be applied in this Opinion to determine whether Apollo has proven a likelihood of success on the merits for its claims against Centrosphere.

courts for preliminary injunctions." [46] *Instant Air*, 882 F.2d at 799 (quoting *System Operations*, 555 F.2d at 1141).

The Circuit has established that, to prevail on its application for a preliminary injunction, the moving party must show:

(1) the probability of irreparable injury to the moving party in the absence of relief; (2) the [absence of] a possibility of harm to the non-moving party if relief were granted; (3) the likelihood of success on the merits; and (4) the public interest [in granting preliminary relief].

*Alessi v. Pennsylvania, Dept. of Pub. Welfare*, 893 F.2d 1444, 1447 (3d Cir.1990); *see also S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 374 (3d Cir.1992); *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.*, 963 F.2d 628, 632 (3d Cir.1992); *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 191–92 (3d Cir.1990); *Instant Air*, 882 F.2d at 800; *Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1116 (3d Cir.1989); *Glenside West Corp. v. Exxon Co., U.S.A.*, 761 F.Supp. 1118, 1132 (D.N.J.1991); *CPC Int'l, Inc. v. Caribe Food Distrib.*, 731 F.Supp. 660, 664 (D.N.J.1990); *Bascom Food Prods. Corp. v. Reese Finer Foods, Inc.*, 715 F.Supp. 616, 624 (D.N.J.1989).

Of these four requirements, the Circuit has placed particular weight on the probability of irreparable harm and the likelihood of success on the merits, stating: "[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent." *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir.1990) (quoting *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982)); *see also Instant Air*, 882 F.2d at 800; *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir.1987); *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir.1984).

Significantly, the Circuit has repeatedly stated that a "grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances." *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988); *accord Chez Sez III Corp. v. Union*, 945 F.2d 628, 634 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992); *Instant Air*, 882 F.2d at 800; *United States v. Philadelphia*, 644 F.2d 187, 191 n. 1 (3d Cir.1980); *see also Driscoll Potatoes, Inc. v. N.A. Produce Co.*, 765 F.Supp. 174, 176 (D.N.J. 1991).

2. *Likelihood of Success on the Merits* [47]

Parties seeking injunctive relief must make a preliminary showing that they are likely to succeed on the merits of their claims. This requirement is satisfied if the moving party "make[s] a showing of a reasonable probability, not the certainty, of success on the merits." *SK & F Co. v. Premo Pharmaceutical Labs., Inc.*, 625 F.2d 1055, 1066–67 (3d Cir.1980) (citations omitted). Nevertheless, a preliminary injunction cannot be issued when there are disputed issues of fact. *Hunterdon Transformer Co. v. Cook*, 89–3132, 1990 WL 10342 *1 1990 U.S.Dist. LEXIS 1382 *3–4 (D.N.J. 6 Feb. 1990) (citing *Charles Simkin & Sons, Inc. v. Massiah*, 289 F.2d 26, 29 (3d Cir.1961)); *see also Oxford House–Evergreen v. Plainfield*, 769 F.Supp. 1329, 1342–43 (D.N.J.1991).

Apollo states the following claims against Centrosphere: (1) breach of contract, (2) breach of fiduciary duty, (3) unfair competition and (4) intentional interference with prospective contractual relations. Complaint at 11–19. Each of these claims is considered in turn.

---

**46.** Throughout its papers, Apollo cites law from outside the Circuit in discussing when it is appropriate for a court to issue an injunction. *See, e.g.,* Moving Brief at 23, 26–27; Reply Brief at 12–14. This law is inapplicable in determining the proper standards in the case at bar.

**47.** Because it is clear Apollo has not demonstrated irreparable injury, *see infra* at pp. 1205– 1211, discussion of the likelihood of success on the merits would not be necessary. Nevertheless, because many of the concepts involved in this motion are implicated in the irreparable injury discussion, a full discussion on the merits is necessary.

### a. Breach of Contract

Apollo's claim for breach of contract against Centrosphere alleges that Centrosphere violated the Non–Compete and Confidentiality Clauses of the Second Agency Contract. *Id.* at 11. Apollo has demonstrated that Centrosphere has entered into competition with Apollo in the sale of fuel additives. *See supra* at pp. 1178–1179. Centrosphere's numerous letters to NAPOCOR suggesting that the Second Trial Order be placed with Centrosphere rather than with Apollo demonstrate this competition. Becker Aff., Exs O, Q, R, T.

The question remains, however, whether Apollo has demonstrated that the covenant not to compete in the Second Agency Contract would be enforceable under New York law. *Baker's Aid v. Hussmann Foodservice Co.*, 730 F.Supp. 1209, 1213 (E.D.N.Y.1990) ("[e]nforceability of restrictive covenant is a threshold question that must be resolved before it can be determined whether the Agreement has been breached").

Under New York law, covenants not to compete are viewed unfavorably and are narrowly construed. *Consolidated Brands, Inc. v. Mondi*, 638 F.Supp. 152, 156 (E.D.N.Y.1986); *Columbia Ribbon & Carbon Mfg. v. A–1–A Corp.*, 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 369 N.E.2d 4 (1977). As one court has stated: "Contracts to restrain competition are generally against public policy, illegal and void." *Atkin v. Union Processing Corp.*, 77 A.D.2d 790, 791, 430 N.Y.S.2d 735, 736 (4th Dep't 1980). "Covenants restricting competition are enforceable only to the extent that they satisfy the overriding requirement of reasonableness." *Reed, Roberts Assoc., Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976); *see also Tender Loving Care v. Franzese*, 131 A.D.2d 747, 748, 517 N.Y.S.2d 50, 51 (2d Dep't 1987).

"[R]easonableness must be measured by the circumstances and context in which enforcement is sought." *Gelder Medical Group v. Webber*, 41 N.Y.2d 680, 684–85, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977); *see also Sprinzen v. Nomberg*, 46

N.Y.2d 623, 628, 415 N.Y.S.2d 974, 389 N.E.2d 456 (1979); *Reed, Roberts*, 40 N.Y.2d at 307, 386 N.Y.S.2d 677, 353 N.E.2d 590; *Greenwich Mills Co. v. Barrie House Coffee Co.*, 91 A.D.2d 398, 400–01, 459 N.Y.S.2d 454, 456 (2d Dep't 1983). To determine the standard by which to judge a restrictive covenant, "the court must consider the type and breadth of the restriction as well as the nature of the business or service involved." *Arthur Young & Co. v. Galasso*, 142 Misc.2d 738, 538 N.Y.S.2d 424, 428 (Sup.Ct.N.Y.County 1989).

Covenants restricting competition are of several types and requirements. *Baker's Aid*, 730 F.Supp. at 1213; *Alexander & Alexander Servs., Inc. v. Maloff*, 105 A.D.2d 1066, 1067, 482 N.Y.S.2d 386, 387 (4th Dep't 1984). For instance, if a contract for the sale of a business contains an express covenant not to compete, it will be enforceable if it is reasonable in time, geographical scope and extent. *Reed, Roberts*, 40 N.Y.2d at 307, 386 N.Y.S.2d 677, 353 N.E.2d 590; *Alexander & Alexander*, 105 A.D.2d at 1067–68, 482 N.Y.S.2d at 387. In an employment contract, however, a covenant not to compete must meet more than these criteria.

A covenant not to compete in an employment setting will be specifically enforceable only to the extent that it is also "necessary to protect employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *Reed, Roberts*, 40 N.Y.2d at 307, 386 N.Y.S.2d 677, 353 N.E.2d 590; *see also Sprinzen*, 46 N.Y.2d at 631–32, 415 N.Y.S.2d 974, 389 N.E.2d 456; *Gelder Med. Group*, 41 N.Y.2d at 683, 394 N.Y.S.2d 867, 363 N.E.2d 573; *Mallory Factor, Inc. v. Schwartz*, 146 A.D.2d 465, 467, 536 N.Y.S.2d 752, 753 (1st Dep't 1989); *Weintraub v. Schwartz*, 131 A.D.2d 663, 664–65, 516 N.Y.S.2d 946, 948 (2d Dep't 1987); *Alexander v. Alexander*, 105 A.D.2d at 1067–68, 482 N.Y.S.2d at 387.

The New York Court of Appeals has stated that specific enforcement of an employee's agreement not to compete should not be ordered "unless necessary to protect

the trade secrets, customer lists or good will of the employer's business, or perhaps when the employer is exposed to special harm because of the unique nature of the employee's services." *American Broadcasting Cos. v. Wolf,* 52 N.Y.2d 394, 403, 438 N.Y.S.2d 482, 420 N.E.2d 363 (1981); *accord Reed, Roberts,* 40 N.Y.2d at 308, 386 N.Y.S.2d 677, 353 N.E.2d 590; *Garfinkle v. Pfizer, Inc.,* 162 A.D.2d 197, 556 N.Y.S.2d 322, 323 (1st Dep't 1990); *Tender Loving Care,* 131 A.D.2d at 749, 517 N.Y.S.2d at 51; *Newco Waste Sys., Inc. v. Swartzenberg,* 125 A.D.2d 1004, 1005, 510 N.Y.S.2d 399, 400 (4th Dep't 1986); *see also McKay v. Communispond, Inc.,* 581 F.Supp. 801, 806 (S.D.N.Y.1983) (New York courts will enforce a restrictive covenant only if the employee is revealing trade secrets).

 Restrictive covenants are enforceable only if the confidential information is not readily ascertainable from independent sources, and then only to the extent necessary to protect an employer from unfair competition. *Newco Waste Sys.,* 125 A.D.2d at 1005, 510 N.Y.S.2d at 400; *see also Prime Enters. v. Bachner,* 148 A.D.2d 350, 352, 539 N.Y.S.2d 320, 321 (1st Dep't 1989) (non-compete clauses are enforceable only to extent they afford employer demonstrably necessary protection against unfair competition stemming from use or disclosure of trade secrets); *Up–Grade Educational Serv., Inc. v. Rappaport,* 136 A.D.2d 628, 629–30, 523 N.Y.S.2d 872, 873 (2d Dep't 1988) (same).

The same criteria for employment contracts have been applied in situations involving agency-type relationships. *See, e.g., Ecolab, Inc. v. K.P. Laundry Mach., Inc.,* 656 F.Supp. 894, 896, 898–99 (S.D.N.Y.1987) (contract establishing distributorship); *Gelder Medical,* 41 N.Y.2d at 683, 394 N.Y.S.2d 867, 363 N.E.2d 573 (contracts establishing professional associations or partnerships); *Up–Grade,* 136 A.D.2d at 628–30, 523 N.Y.S.2d at 873 (licensing agreements); *Arthur Young,* 538 N.Y.S.2d at 428–29 (partnership contract).

In the case at bar, the Non–Compete Clause is broad. The Non–Compete Clause reads:

> [Centrosphere] agrees not to manufacture or sell *anywhere* ... any ... products or services that are competitive with Apollo's products for the duration of this agreement and for three years thereafter. Likewise in the Philippines, [Centrosphere] will not handle *any* other products that are competitive with the above.

Becker Aff., Ex. A (emphasis added). Covenants of this type have been struck down by New York courts.

For example, in *Columbia Ribbon & Carbon Mfg.,* the Court of Appeals struck down a clause almost identical to this one. The *Columbia* clause read:

> The Employee further covenants that he will not, for a period of twenty-four months after termination of his employment, sell or deliver any goods, wares and merchandise of the kind or character sold by the Company at any time during the term of his employment.

42 N.Y.2d at 498, 398 N.Y.S.2d 1004, 369 N.E.2d 4. The Court of Appeals stated: "It is clear that its broad-sweeping language is unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or even competitive unfairness. It does no more than baldly restrain competition." *Id.* at 499, 398 N.Y.S.2d 1004, 369 N.E.2d 4; *see also Great Lakes Carbon Corp. v. Koch Indus., Inc.,* 497 F.Supp. 462, 466, 471 (S.D.N.Y.1980) (striking down covenant restricting employee from "undertak[ing] any employment competitive with Company"); *Up–Grade,* 136 A.D.2d at 628, 523 N.Y.S.2d at 873 (striking down noncompete covenant prohibiting employee from being "associated, directly or indirectly ... with the operation of any business competitive with [the employer]").

In contrast, cases in which non-competition covenants have been upheld have emphasized the narrowness of those provisions. For instance, in upholding a restrictive covenant in *Mallory Factor,* the court emphasized that the defendant "was not restricted from seeking employment in any geographical region, nor was he precluded

from obtaining employment with any [of plaintiff's] competitor[s], or from establishing his own public relations firm." 146 A.D.2d at 467–68, 536 N.Y.S.2d at 754. Rather, the court stated, the defendant "was restricted only from performing work for any account [he] had been involved with during [his] term of employment." *Id.; see also Ecolab, Inc.,* 656 F.Supp. at 898–89 (restrictive covenant reasonable where employee prohibited only from soliciting clients personally solicited while in plaintiff's employ); *Greenwich Mills,* 91 A.D.2d at 401, 459 N.Y.S.2d at 457 (upholding non-compete clause and stating "much will depend on whether the covenant involves a total ban on competition with the former employer or, as here, the far lesser restriction of a ban on solicitation of its customers").

■■■ Apollo has not demonstrated that the Non–Compete Clause satisfies the other requirements necessary for a valid covenant not to compete. For instance, Apollo has not demonstrated that the Non–Compete Clause is specifically designed to protect its trade secrets or to prevent unfair competition. The Non–Compete Clause does not just protect against Centrosphere using the information it obtained from Apollo. Rather, the Non–Compete Clause prohibits Centrosphere from dealing with any other supplier of fuel additives or engaging in any activity related to the supply of fuel additives.

These limitations, in turn, may be unduly oppressive to Centrosphere. Centrosphere was founded in April 1990, prior to its dealings with Apollo, for the purpose of supplying fuel additives and related technology to entities in the Philippines. Widjaja Aff., ¶ 10; Opp. Brief at 2–3. By prohibiting Centrosphere from engaging in this activity, the Non–Compete Clause pro-

hibits Centrosphere from functioning at all. As the Court of Appeals has stated: "Even an otherwise valid covenant not to compete will not be enforced if it would be unreasonable in time, space or scope, or would operate in a harsh or oppressive manner." *Wolff v. Wolff,* 67 N.Y.2d 638, 641, 499 N.Y.S.2d 665, 490 N.E.2d 532 (1986); *American Broadcasting Co.,* 52 N.Y.2d at 403–04, 438 N.Y.S.2d 482, 420 N.E.2d 363; *see also Great Lakes Carbon,* 497 F.Supp. at 471 (covenant that would bar employee from all employment was "beyond legal limits"); *Reed, Roberts,* 40 N.Y.2d at 307, 386 N.Y.S.2d 677, 353 N.E.2d 590 ("power considerations of public policy ... militate against sanctioning the loss of a man's livelihood").

Finally, Apollo also argues that Centrosphere breached the Confidentiality Clause of the Second Agency Agreement. Apollo has not shown the likelihood of success on this point either. The Confidentiality Clause expressly states: "[Centrosphere] will maintain in the strictest confidence and not divulge to any party ... the company trade secrets." Becker Aff., Ex. A. Despite this language, Apollo has not argued or demonstrated that Centrosphere has divulged any trade secrets.[48] Apollo's sole argument on this issue is that Centrosphere has utilized trade secrets and *will* disclose trade secrets. Moving Brief at 7–8, 13, 21–24. While utilizing trade secrets may give rise to some other cause of action, it does not appear to violate the Confidentiality Clause of the Second Agency Contract.

■■■ Because Apollo has failed to demonstrate either that the Non–Compete Clause is valid and enforceable [49] or that Centrosphere actually disclosed trade secrets in violation of the Confidentiality

**48.** Failure to show that trade secrets are actually being revealed also cuts against enforcing the Non–Compete Clause. *McKay,* 581 F.Supp. at 806.

**49.** Apollo's contention that a court can sever the unenforceable parts of a restrictive covenant and enforce only the reasonable parts does not affect this analysis. Review for preliminary injunction purposes is designed to make a thresh-

old determination on whether Apollo has demonstrated a likelihood of success on the merits. Such a review is not designed to decide the merits of the controversy or to predict the specific remedial steps that equity may later require. *United States v. Local 560 (I.B.T.),* 974 F.2d 315, 330 (3d Cir.1992) (preliminary injunction ruling "is only a prediction about the merits of case").

Clause, Apollo has not demonstrated a likelihood or reasonable probability of success on the merits on this claim.

### b. Breach of Fiduciary Duty

Apollo claims Centrosphere breached its fiduciary duty as an agent for Apollo by (1) retaining Widjaja who was allegedly blacklisted from working in the Philippines, (2) failing to inform Apollo of this alleged blacklisting, (3) offering to sell Apollo products without Apollo's authorization, (4) failing to send technical people to the Malaya Plant, (5) requiring excessive technical support from Apollo, (6) failing to meet its financial commitments under the Agency Contracts, (7) continuing to act as Apollo's agent without authorization after the alleged termination of the Second Agency Contract and (8) utilizing confidential information acquired from Apollo in competing with it.[50] Complaint at 12–15; Moving Brief at 14–16, 22.

### (1) *An Agent's Duties to its Principal*

An agency is a fiduciary relationship which results from a manifestation of consent by a principal to agent that the agent shall act on the principal's behalf and subject to the principal's control, and subject to the consent of the agent to act. *Meese v. Miller,* 79 A.D.2d 237, 241, 436 N.Y.S.2d 496, 499 (4th Dep't 1981); *L. Smirlock Realty Corp. v. Title Guar. Co.,* 70 A.D.2d 455, 464, 421 N.Y.S.2d 232, 238 (2d Dep't 1979), *modified,* 52 N.Y.2d 179, 437 N.Y.S.2d 57, 418 N.E.2d 650 (1981); Restatement (Second) of Agency § 1. An agent is a fiduciary with respect to all matters within the scope of the agency. Restatement (Second) of Agency § 13;

*Quintel Corp., N.V. v. Citibank, N.A.,* 567 F.Supp. 1357, 1362–63 (S.D.N.Y.1983); *see also Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545 (1928) (fiduciary relationship involves "not honesty alone, but the punctilio of an honor most sensitive").

Authority to act as agent means an agent can only act for the benefit of the principal. Restatement (Second) of Agency §§ 39, 387; *United Technologies Communications Co. v. International Brotherhood of Elec. Wkrs. Local Union No. 3,* 597 F.Supp. 265, 284 (S.D.N.Y.1984); *Sea Lar Trading Co. v. Michael,* 107 Misc.2d 93, 433 N.Y.S.2d 403, 406 (Sup.Ct.N.Y.County 1980). Among other things, this means an agent may not deal with his principal as an adverse party in a transaction connected with his agency or compete with the principal concerning the subject matter of the agency.[51] Restatement (Second) of Agency §§ 389, 393; *see also* § 393 comment b ("an agent to buy or sell for the principal must not buy or sell in competition with the principal").

As for confidential information, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency ... in competition with or to the injury of the principal although such information does not relate to the transaction in which he is then employed, unless the information is a matter of general knowledge.

---

**50.** The final claim—that Centrosphere utilized confidential information in competing with Apollo—is not stated in the Complaint. It is, however, the primary argument advanced in the Moving Brief. Neither the Moving Brief nor the Reply Brief argues that Centrosphere breached its fiduciary duty by (1) hiring Widjaja, (2) failing to inform Apollo of Widjaja's alleged blacklisting and (3) failing to send technical and financial support to the Trial Program. Because Apollo has not attempted to prove a likelihood of success as to these matters, and because the facts constituting these matters appear to be in dispute, *Oxford–Evergreen,* 769 F.Supp. at 1343; *Hunterdon Transformer,* 1990 WL 10342

at *2, 1990 U.S.Dist. LEXIS 1382 at *4, this Opinion considers only the following claims: (1) Centrosphere purported to act as Apollo's agent following the termination of the agency relationship and (2) Centrosphere is competing with Apollo and is utilizing confidential information to do so.

**51.** If an agent receives anything as a result of a violation of the agent's duty of loyalty to the principal, the agent is subject to liability to deliver the thing, its value or its proceeds to the principal. Restatement (Second) of Agency § 403; *Wolff,* 67 N.Y.2d at 641, 499 N.Y.S.2d 665, 490 N.E.2d 532.

*Id.*, § 395; *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir.1983) (citing *Byrne v. Barrett*, 268 N.Y. 199, 206, 197 N.E. 217 (1935)). This rule applies to "information which the agent should know his principal would not care to have revealed to others or used in competition with him." *Id.*, § 395, comment b. Specifically, it applies to "unique business methods of the employer, trade secrets, lists of names, and all other matters peculiarly known in the employer's business." *Id.* The rule does not apply to matters of common knowledge in the community nor to special skills which the employee has acquired because of his employment. *Id.; Byrne*, 268 N.Y. at 207, 197 N.E. 217 (information is not general if it is "something known only to one or a few and kept from others").

 An agent's duty of confidentiality does not end upon termination of the agency. Restatement (Second) of Agency § 396(b); *ABKCO Music*, 722 F.2d at 994; *Byrne*, 268 N.Y. at 206, 197 N.E. 217. Specifically, after the termination of the agency, the agent "has a duty to the principal not to use or to disclose to third persons ... in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use." Restatement (Second) of Agency § 396(b); *see also Carpenter v. United States*, 484 U.S. 19, 26, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987) (ownership of information obtained during agency belongs to principal); *In re Estate of Corning*, 108 A.D.2d 96, 102, 488 N.Y.S.2d 477, 481–82 (same), *appeal dismissed*, 66 N.Y.2d 695, 496 N.Y.S.2d 424, 487 N.E.2d 281 (1985). Nevertheless, the agent "is entitled to use general information concerning the method of business of the principal and the names of customers retained in his memory." Restatement (Second) of Agency § 396(b). A terminated agent may also use in competition with its former principal or otherwise any skill which he may have acquired during his agency.

The line between what information an agent may and may not use following termination is not a clear one. As the comment to Section 396 of the Second Restatement of Agency states:

> Information ... is barred from use in competition only to the extent that, considering all the circumstances, it would be unfair to his former employer for the agent to use it.... Thus, although an agent cannot properly subsequently use copies of written memoranda ... or processes which the employer has kept secret from other manufacturers, [the agent] is normally privileged to use, in competition with the principal, ... methods of doing business and processes which are but skillful variations of general processes known to the particular trade.

*Id.*, § 396 comment b; *Riteoff, Inc. v. Contact Indus., Inc.*, 43 A.D.2d 731, 732, 350 N.Y.S.2d 690, 692 (2d Dep't 1973) (secret cleaning formula constituted trade secret and agent breached duty of confidentiality when, following termination of employment, it manufactured and sold cleaning product identical to that of principal).

### (2) *Termination of the Agency Relationship*

 An agent's authority exists only during the period in which, from the manifestations of the principal and the happening of events which the agent has notice, the agent reasonably believes that the principal desires the agent to act. *Id.*, § 38.

 Actual authority for an agency may terminate in a number of ways. A principal has the right to revoke the agency at any time, even though the principal has contracted with the agent for a definite period of time. *Id.*, § 386 comment b; *Sea Lar Trading*, 433 N.Y.S.2d at 406; *Smith v. Conway*, 198 Misc. 886, 101 N.Y.S.2d 529, 531 (Sup.Ct.N.Y.County 1950) (citing cases), *aff'd*, 278 A.D. 566, 102 N.Y.S.2d 445 (1951). Where a principal wrongfully terminates an agent's authority, the agent may maintain an action against the principal, but it may not continue to act as an agent. Restatement (Second) of Agency §§ 168 & comment a, 386 & comment b.

An agency also terminates when authority is conferred for a specific period of time or upon the happening of a specific event, and either the time expires or the event occurs. *Id.*, § 105; *Carvel Corp. v. Nicolini*, 144 A.D.2d 611, 611–12, 535 N.Y.S.2d 379, 380–81 (2d Dep't 1988). An agent's authority will terminate when the agent has express notice of termination from the principal or has notice of the happening of an event or of a change in circumstances, from which the agent should reasonably infer that the principal no longer consents to the agent's exercise of authority. *Id.*, §§ 134, 168 & comment b. Furthermore, an agent's authority will terminate if, without knowledge of the principal, the agent acquires an adverse interest or is guilty of a serious breach of loyalty to the principal.[52] *Id.*, § 112.

### (3) *What Constitutes Trade Secrets*

New York has substantially adopted the approach of the Restatement (First) of Torts to the law of trade secrets. *Delta Filter Corp. v. Morin*, 108 A.D.2d 991, 991–92, 485 N.Y.S.2d 143, 144 (3d Dep't 1985); *see also Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir.1990); *Q–Co Indus. v. Hoffman*, 625 F.Supp. 608, 616 (S.D.N.Y.1985); *Sheridan v. Mallinckrodt, Inc.*, 568 F.Supp. 1347, 1351 (N.D.N.Y. 1983).

Generally, trade secrets have been defined as "information known only to a few and not the general public." *Consolidated Brands*, 638 F.Supp. at 156; *McKay*, 581 F.Supp. at 807. More specifically, the First Restatement of Torts provides that trade secrets are

any formula, pattern, device or compilation of information which is used in one's business, and which gives [the business] an opportunity to obtain an advantage

over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.... Generally, it relates to the production of goods, as, for example, a machine or formula for the production of an article.

Restatement (First) of Torts § 757 comment b; *see also Integrated Cash*, 920 F.2d at 173; *Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc.*, 732 F.Supp. 370, 375 (S.D.N.Y.1989), *aff'd*, 920 F.2d 171 (2d Cir.1990); *Q–Co Indus.*, 625 F.Supp. at 616; *McKay*, 581 F.Supp. at 807; *Delta Filter*, 108 A.D.2d at 992, 485 N.Y.S.2d at 144; *Eagle Comtronics, Inc. v. Pico, Inc.*, 89 A.D.2d 803, 804, 453 N.Y.S.2d 470, 472 (4th Dep't 1982)

A trade secret can exist "in combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process and operation of which, in unique combination, affords a competitive advantage and is a protectible secret." *Integrated Cash*, 732 F.Supp. at 376 (quoting *Imperial Chemical Indus. v. National Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir.1965)); *see also Integrated Cash*, 920 F.2d at 173; *McKay*, 581 F.Supp. at 807.

In determining whether a method or process deserves trade secret protection, secrecy is an essential requisite. *Delta Filter*, 108 A.D.2d at 992, 485 N.Y.S.2d at 144. Secrecy is used by the First Restatement in two senses: (1) as substantial exclusivity of knowledge of the formula, process, device or compilation of information and (2) as the employment of precautionary measures to preserve such exclusive knowledge by limiting legitimate access by others.[53] *Id.; see also Ecolab, Inc.*

---

**52.** Termination of actual authority does not terminate an agent's apparent authority. *Id.*, § 125. Apparent authority does not terminate until a third party with whom the agent has been dealing receives notice that the agent's authority has been terminated. *Id.*, §§ 125, 129; *Frank Mastoloni & Sons, Inc. v. United States Postal Service*, 546 F.Supp. 415, 420–21 (S.D.N.Y.1982). From the submissions, Centro-

sphere's apparent authority ended when Apollo informed NAPOCOR on 7 July 1992 that Centrosphere was no longer Apollo's agent. Kukin Aff., ¶ 18; Becker Aff., ¶ 51, Ex. P.

**53.** Even so, the law does not protect the owner of a trade secret from "discovery by fair and honest means such as independent invention, accidental disclosure, or by so-called reverse

*v. Paolo,* 753 F.Supp. 1100, 1111 (E.D.N.Y. 1991); *Integrated Cash,* 732 F.Supp. at 375; *McKay,* 581 F.Supp. at 807.

■■■■■ Matters of public or general knowledge in an industry cannot be trade secrets. *Sheridan,* 568 F.Supp. at 1352 (citing *Ferber v. Sterndent Corp.,* 51 N.Y.2d 782, 783–84, 433 N.Y.S.2d 85, 412 N.E.2d 1311 (1980)); *Delta Filter,* 108 A.D.2d at 992, 485 N.Y.S.2d at 144; *see also* Restatement (First) of Torts § 757 comment b ("a trade secret is known only in the particular business in which it is used"). Similarly, a substantial element of secrecy must exist such that there is difficulty in acquiring the information. *Sheridan,* 568 F.Supp. at 1352; *Delta Filter,* 108 A.D.2d at 992, 485 N.Y.S.2d at 144; Restatement (First) of Torts § 757 comment b. Thus, under New York law, a plaintiff may not recover for a trade secret when the idea has become part of the public domain through the issuance of a patent. *Ferber,* 51 N.Y.2d at 784, 433 N.Y.S.2d 85, 412 N.E.2d 1311; *Laurie Visual Etudes, Inc. v. Chesebrough–Pond's, Inc.,* 83 A.D.2d 505, 506, 441 N.Y.S.2d 88, 89 (1st Dep't 1981).

When the appropriate novelty and secrecy exist, courts have found customer information protectible as trade secrets. For instance, lists of customers have qualified as trade secrets. *Defiance Sutton Mach. Co. v. C & C Metal Prods. Corp.,* 759 F.2d 1053, 1063 (2d Cir.), *cert. denied,* 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); *Isra Fruit, Ltd. v. Agrexco Agricultural Exp. Co. Ltd.,* 631 F.Supp. 984, 989–90 (S.D.N.Y.1986), *appeal denied,* 804 F.2d 24 (2d Cir.1986); *New York State Businessmen's Grp., Inc. v. Dalton,* 154 A.D.2d 801, 801, 546 N.Y.S.2d 469, 470 (3d Dep't

1989). Courts have found price discount and customer product use and preference information to be trade secrets. *Ecolab,* 753 F.Supp. at 1112; *Webcraft Tech., Inc. v. McCaw,* 674 F.Supp. 1039, 1044–47 (S.D.N.Y.1987); *Giffords Oil Co. v. Wild,* 106 A.D.2d 610, 611, 483 N.Y.S.2d 104, 106 (2d Dep't 1984).

(4) *Apollo's Claim that Centrosphere Breached Its Fiduciary Duty By Purporting to Act as Apollo's Agent Following Termination of the Second Agency Contract*

■■■ The Second Agency Contract was expressly limited to a term of one year, unless Centrosphere obtained a "long-term commitment" from a Philippine client within that time. Widjaja Aff., Ex. 3; Opp. Brief at 5; Becker Aff., ¶ 22; Kukin Aff., ¶ 5(1). Centrosphere does not contest the fact that it failed to secure a long term commitment within one year from the effective date of the Second Agency Contract. Opp. Brief at 19. The Second Agency Contract terminated by its own terms on 31 December 1991, one year from its execution. Restatement (Second) of Agency § 105; *Carvel,* 144 A.D.2d at 611–12, 535 N.Y.S.2d at 380–81. Centrosphere was aware of this termination date and reasonably should have realized its authority had been revoked.

In opposition, Centrosphere argues that, by reading the Agency Contracts together, the Second Agency Contract could not terminate until the First Agency Contract was complete. Opp. Brief at 19. Centrosphere states:

Apollo was aware that the start of the [Trial Program], originally scheduled to begin in December of 1990, had been delayed until September of 1991,[54] and

---

engineering." *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 476, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974); *Telerate Sys., Inc. v. Caro,* 689 F.Supp. 221, 232 (S.D.N.Y.1988). Nevertheless, the mere possibility of reverse engineering does not preclude the finding of a trade secret. *Telerate Sys.,* 689 F.Supp. at 232–33. It is one factor to consider in determining the novelty of the alleged trade secret. *Id.* at 233. Moreover, the proper inquiry is not whether an alleged trade secret can be deduced by reverse engineer-

ing, but whether improper means are required to access it. *Id.*

**54.** Centrosphere's suggestion that the delay of the trial period was caused by Apollo supply problems, *see* Opp. Brief at 6, does not appear credible in light of the documentation submitted by Apollo. Kukin Exhibits, Exs. 6, 10–11; Becker Aff., Ex. C. This documentation indicates that shipments to the Philippines were made in March and April 1991 and that the reason shipments were delayed that long was

that Centrosphere could not possibly have obtained a long term commitment before the expiration date of the [Second Agency Contract].... It can be inferred, from the terms of the [Agency Contracts] that the intent was to acquire a long term contract from NAPOCOR, and that the parties knew this could only come to fruition after the end of the four month trial.

*Id.* at 19–21. This argument is not convincing.

While the First Agency Contract specifically references the Second Agency Contract, the Second Contract mentions neither the First Agency Contract nor the NAPOCOR Trial Program. Widjaja Aff., Ex. 3. The Expiration Clause is stated in general and unconditional terms. It states: "This agreement shall run initially for one year. Provided that [Centrosphere is] able to obtain a long term commitment in the Philippines within one year, then this agreement will be extended ..." *Id.* The Expiration Clause does not state that the contract will be extended pending completion of the Trial Program or on account of unexpected delay in initiating the trial program. Nor does it say Centrosphere must obtain a long-term commitment specifically from NAPOCOR. Centrosphere was free to pursue other clients in addition to NAPOCOR.

It is uncontested that Centrosphere continued to act as Apollo's agent following 31 December 1992. In June 1992, Centrosphere wrote to NAPOCOR offering to sell products on behalf of its "principal" at discounts "agreed [to by] our principal."

Kukin Exhibits, Ex. O; *see also id.*, Ex. Q (letter from Centrosphere recognizing that Centrosphere had been acting as Apollo's agent prior to 7 July 1992). Assuming *arguendo* that Centrosphere was justified in not considering its agency terminated on 31 December 1991, it had no reason in June 1992 to believe it was still authorized to act on behalf of Apollo.[55] By letter dated 24 January 1992, Apollo expressly notified Centrosphere that "[s]ince our contract with [Centrosphere] has already expired, we have no legal commitment to continue our relationship." Becker Aff., Ex. E. Similarly, Centrosphere does not deny that, on 7 February 1992, it was again informed by Apollo that its authority to act as Apollo's agent had expired. Becker, Ex. F; *see also* Opp. Brief at 14 (mentioning without denying this notification).

Once notified that its agency was terminated, Centrosphere was prohibited from holding itself out as Apollo's agent.[56] Restatement (Second) of Agency §§ 134, 168 & comment b. Centrosphere's argument that Apollo's termination of its agency was wrongful does not alter this conclusion. As indicated above, a principal may revoke an agency at any time, even though the principal has contracted with the agent for a definite period of time. *Id.*, § 386 comment b; *Sea Lar Trading*, 433 N.Y.S.2d at 406; *Smith*, 101 N.Y.S.2d at 531. As mentioned, if the termination is wrongful, the agent may have an action for damages, but it cannot continue to act on behalf of the principal. Restatement (Sec-

because of Centrosphere's repeated failure to obtain the Letter of Credit from NAPOCOR. *See id.; see also* Kukin Aff., ¶¶ 6–8.

55. Overall, Centrosphere's arguments are not consistent. If the expiration of the Second Agency Contract was contingent upon completion of the First Agency Contract, then the agency relationship should have expired in late February 1992. On 27 February 1992, Centrosphere withdrew from its participation in the Trial Program "due to the [Trial program's] completion." Becker Aff., Ex. I. No long-term commitment had been secured by Centrosphere by the date of its withdrawal. Centrosphere's own arguments cannot support the existence of an agency relationship with Apollo in June 1992.

56. Even if an agency relationship existed with Apollo in June 1992, it appears Centrosphere still violated its fiduciary duties to Apollo by its 22 June 1992 offer to NAPOCOR. This letter expressly urges NAPOCOR to withdraw acceptance of the Second Trial Order from Apollo and place the order instead with Centrosphere. Becker Aff., Ex. O. Such an action appears to violate the basic agency principles that an agent must act only for the benefit of its principal, may not compete with its principal and may not use a principal's business opportunity for its own benefit. Restatement (Second) of Agency §§ 39, 387, 389, 393, 393 comment b; *United Technologies*, 597 F.Supp. at 284; *Sea Lar Trading*, 433 N.Y.S.2d at 406.

ond) of Agency §§ 168 & comment a, 386 & comment b.

Apollo has demonstrated the likelihood of success on its breach of fiduciary duty claim arising from Centrosphere's continuing to hold itself out as Apollo's agent after the expiration of the agency relationship.

(5) *Apollo's Claim that Centrosphere Breached Its Fiduciary Duty By Utilizing Confidential Information and Trade Secrets in Competition with Apollo*

■ Apollo claims that Centrosphere has used confidential information and trade secrets obtained from Apollo to compete with Apollo. While it is not contested that Centrosphere has entered into competition with Apollo for NAPOCOR's business, Widjaja Aff., ¶ 31; Opp. Brief at 7; Becker Aff., Exs. O, Q–T, the question remains whether the information sought to be protected by Apollo constitutes protectible trade secret material.

Apollo claims Centrosphere was exposed to and has utilized its trade secrets:

These trade secrets include technologies utilized in the application of additives and the operation of electrical equipment utilized to inject the additives into the boilers. More particularly, these trade secrets include [1] the specific rates of feed of the chemical additives, [2] proper locations of additive injection ports within the boilers, [3] the appropriate time to initiate and shut down application of the additives, [4] methods of testing of flue gases and analysis of results, [5] methods for operating the feed equipment during various boiler operating conditions ... [and 6] the appropriate amount and mix of additives to utilize.

Moving Brief at 7, 17. Apollo also argues that "[w]ithout this confidential information, [Centrosphere] could not supply additives to NAPOCOR"[57] and Centrosphere had "no prior business experience before its involvement with Apollo." Moving Brief at 2–3, 7–8, 17; Complaint, ¶ 17.

As discussed above, a trade secret is a "formula, pattern, device or compilation of information which is used in one's business." Restatement (First) of Torts § 757 comment b. It may also be "a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers." *Id.* Generally, however, a trade secret relates to the production of goods, as, for example, a machine or formula for the production of an article." *Id.; see also Integrated Cash,* 920 F.2d at 173; *Integrated Cash,* 732 F.Supp. at 375; *Q–Co Indus.,* 625 F.Supp. at 616; *McKay,* 581 F.Supp. at 807; *Eagle Comtronics,* 89 A.D.2d at 804, 453 N.Y.S.2d at 472. A terminated agent cannot be prohibited from using "any skill which he may have acquired during his agency." Restatement (Second) of Agency § 396 comment h. It has also been suggested that an agent may employ information which the agent has casually "retained in [the agent's] memory as the result of his work for the principal." *Id.* at comment b.

■ Apollo has not sufficiently demonstrated that the information it seeks to protect is a trade secret. While Apollo may have created formulae for fuel additives and equipment for additive injection, it does not claim that Centrosphere knows these formulae or has copied Apollo's fuel additives and/or equipment.[58] In contrast, the information that Apollo claims Centrosphere is using is arguably nothing more

---

**57.** Apollo never explains why, without information regarding the application and use of fuel additives—such as the rates of feed, locations of additive injection, times for injection, testing of flue gases and methods of operating feed equipment—Centrosphere would be prevented from supplying the actual product to NAPOCOR.

**58.** Even if Apollo made such a claim, it is not clear that its fuel additives or equipment are still protectible trade secrets. Apollo points out that it has "recent patents covering formulations

of many of its fuel additives, including the products being marketed to NAPOCOR ... and patent coverage on various forms of electronic equipment utilized to inject the chemical additives into the boilers." Becker Aff., ¶ 12. As stated above, a plaintiff may not recover for a trade secret when the idea has become part of the public domain through the issuance of a patent. *Ferber,* 51 N.Y.2d at 784, 433 N.Y.S.2d 85, 412 N.E.2d 1311; *Laurie Visual,* 83 A.D.2d at 506, 441 N.Y.S.2d at 89.

than information and techniques that are readily observable and capable of becoming part of an employee's acquired experience. Once a technician knows when, where, how and at what rate to inject fuel additives into a particular boiler model, that information has become a part of the technician's experience and skills. As the Restatement itself recognizes:

> [T]he skill with which an iron worker can determine the exact moment for pouring molten iron, and the skill of the glass molder in handling his tools, although the result of the master's directions, become part of the personality of the servant which he is entitled to use freely.... Likewise, the skill that comes from aptitude plus training ... becomes the agent's to use for himself ...

Restatement (Second) of Agency § 396 comment h; *see also Delta Filter*, 108 A.D.2d at 992–93, 485 N.Y.S.2d at 145 (no trade secret protection where machine could be duplicated without blueprints, from memory to an experienced machinist).

Apollo has failed to demonstrate a number of other essential points in determining the existence of a trade secret. For instance, Apollo does not explain what about its products or process is unique and gives it a competitive advantage. Apollo states on a number of occasions that it enjoys a world-wide reputation in the fuel additive technology. Kukin Aff., ¶ 5; Becker Aff., ¶ 8–9; Kukin Exhibits, Ex. 3. Nevertheless, Apollo recognizes it has competition within the fuel additive business, from such companies as Premier Chemical and Martin Marietta. Kukin Aff., ¶¶ 10, 21.

Apollo does not explain how or the degree to which its technology differs from its competitors.[59] *Sheridan*, 568 F.Supp. at 1352–53 (no trade secret protection where competitors produce product of comparable quality); *Delta Filter*, 108 A.D.2d at 992–93, 485 N.Y.S.2d at 145 (same, where plaintiff failed to show filter

production process was materially different from those of competitors). Skillful variations of general processes known to a particular trade are not trade secrets. Restatement (Second) Agency § 396 comment b. Similarly, matters of public or general knowledge in an industry cannot be trade secrets. *Sheridan*, 568 F.Supp. at 1352 (citing *Ferber*, 51 N.Y.2d at 783–84, 433 N.Y.S.2d 85, 412 N.E.2d 1311; *Delta Filter*, 108 A.D.2d at 992, 485 N.Y.S.2d at 144–45. A "trade secret is known only in the particular business in which it is used." Restatement (First) of Torts § 757 comment b.

Apollo states that "it takes great pains to preserve the confidentiality" of its trade secret information. Complaint ¶ 18, Becker Aff., ¶ 15. Yet, with the exception of requiring employees and agents to sign confidentiality agreements, Apollo does not further explain its steps to maintain confidentiality generally or in the specific case of Centrosphere. Complaint, ¶ 18, Becker Aff., ¶ 15.

In examining such matters, courts have looked to such indicia as whether only necessary information is provided to employees, the type of information presented in promotional literature or disseminated to prospective customers, the number of customers who are exposed to information about the alleged trade secrets, the security measures taken at the plaintiff's physical plant(s) and whether employees are required to return literature received in connection with their employment. *See Integrated Cash*, 920 F.2d at 174; *Ecolab*, 753 F.Supp. at 1112; *Lehman v. Dow Jones & Co.*, 606 F.Supp. 1152, 1161 (S.D.N.Y.1985), *aff'd*, 783 F.2d 285 (2d Cir.1986).

Apollo does not address any of these criteria. The Second Agency Contract specifically requires Centrosphere "to return all literature and documents" upon termination. Becker Aff., Ex. A. Apollo, how-

---

59. In a letter to Centrosphere, dated 23 July 1992, Martin Marietta states:

> Martin Marietta ... the largest magnesium oxide producer and the largest supplier of fuel oil additives in North America, would be pleased to manufacture fuel additive products

to your specifications.... We are capable of manufacturing products similar to Coaltrol F for the cold end additive treatment and SSI-3 for the hot end additive treatment.

Widjaja Aff., Ex. 8.

ever, does not indicate whether Centrosphere complied or even was asked to comply with this provision.[60] Similarly, Apollo objects to the use by Centrosphere of confidential price information in competing with Apollo. Moving Brief at 8 n. 3, 22. Yet, in November 1990, prior to the establishment of an agency relationship between the parties, Apollo, in an unrestricted manner, quoted Centrosphere prices for a number of Apollo's fuel additive products and reviewed the terms under which it would do business with Centrosphere. Kukin Aff., ¶ 5(e).

■ Treatment processes can constitute trade secrets. However, this is a fact-specific determination that defies easy categorization. *Delta Filter,* 108 A.D.2d at 992–93, 485 N.Y.S.2d at 145. Apollo has not sufficiently established the character, novelty or secretness of its fuel additive technology. *See Businessmen's Grp.,* 154 A.D.2d at 801–02, 546 N.Y.S.2d at 470 (conclusory statements in affidavits declaring that information represents "confidential business records and trade secrets ... is palpably insufficient"). Apollo has therefore failed to demonstrate a likelihood of success on this aspect of its fiduciary duty claim.

### c. Unfair Competition

Apollo claims Centrosphere is competing unfairly with Apollo for NAPOCOR's business. Apollo states: "[D]uring the course of its agency relationship with Apollo, Centrosphere received confidential information and trade secrets from Apollo. It is now attempting to use that information to directly compete with Apollo for the business of NAPOCOR, the very customer it was enlisted to aid Apollo in securing." Moving Brief at 25. Apollo also objects to the use by Centrosphere of its pricing and discount

information for NAPOCOR. *Id.* at 2, 8, n. 3.

■ The basic issue in a cause of action for unfair competition is "whether the acts complained of are fair or unfair." *Capitaland Heating & Cooling, Inc. v. Capitol Refrigeration Co.,* 134 A.D.2d 721, 722, 521 N.Y.S.2d 202, 203 (3d Dep't 1987) (quoting *Cigogne, Inc. v. Luxury Trading Corp.,* 13 A.D.2d 928, 929, 216 N.Y.S.2d 558, 559 (1st Dep't 1961)). More specifically, the inquiry under New York law is whether the defendant "has misappropriated the labors and expenditures of another." *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980); *Werlin v. Reader's Digest Ass'n,* 528 F.Supp. 451, 464 (S.D.N.Y.1981); *Electrolux Corp. v. Val–Worth, Inc.,* 6 N.Y.2d 556, 567, 190 N.Y.S.2d 977, 161 N.E.2d 197 (1959).

■ Resolution of an unfair competition claim "requires a complex factual analysis of a variety of factors, including the character and circumstances of the business and the nature of the unfair alleged practices." *Capitaland,* 134 A.D.2d at 722, 521 N.Y.S.2d at 203 (citing *International News Serv. v. Associated Press,* 248 U.S. 215, 236, 39 S.Ct. 68, 71, 63 L.Ed. 211 (1918)); *Sample, Inc. v. Porrath,* 41 A.D.2d 118, 121, 341 N.Y.S.2d 683, 687 (4th Dep't 1973), *aff'd,* 33 N.Y.2d 961, 353 N.Y.S.2d 733, 309 N.E.2d 133 (1974). Although New York law is flexible in the area of unfair competition, *Baker's Aid,* 730 F.Supp. at 1215, a claim for unfair competition requires the plaintiff to prove bad faith on the part of the defendant. *Saratoga,* 625 F.2d at 1044; *accord Werlin,* 528 F.Supp. at 464; *Capitaland,* 134 A.D.2d at 722, 521 N.Y.S.2d at 203; *Sample,* 41 A.D.2d at 124, 341 N.Y.S.2d at 690.

■ Solicitation of an employer's customers by a former employee is not actionable unless there was wrongful conduct by

---

**60.** As well, Apollo does not address Centrosphere's contention that Centrosphere personnel had developed contacts with NAPOCOR and experience in fuel additive technology prior to its contact with Apollo. Widjaja Aff., ¶ 6–9. While Apollo states that Centrosphere had no such experience, *see* Moving Brief at 3, 8, 17, it is clear that Apollo knew Widjaja's former compa-

ny had marketed fuel additives in the Philippines under the direction of ex-Apollo employee Kober. Widjaja Aff., Ex. 1.

What Centrosphere knew prior to meeting with Apollo is relevant to a determination of whether it is improperly using trade secrets in competing with Apollo.

the employee, such a physical taking or copying of the employer's files or using confidential information. *Advanced Magnification Instrs., Ltd. v. Minuteman Optical Corp.*, 135 A.D.2d 889, 891, 522 N.Y.S.2d 287, 289–90 (3d Dep't 1987); *Levine v. Bochner*, 132 A.D.2d 532, 532, 517 N.Y.S.2d 270, 271 (2d Dep't 1987); *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 391–92, 328 N.Y.S.2d 423, 278 N.E.2d 636 (1972). In contrast, use of information about an employer's customers which is based on casual memory, as opposed to studied memorization, is not actionable. *Leo Silfen*, 29 N.Y.2d at 391–92, 328 N.Y.S.2d 423, 278 N.E.2d 636; *Levine*, 132 A.D.2d at 532–33, 517 N.Y.S.2d at 271; *Continental Dynamics Corp. v. Kanter*, 64 A.D.2d 975, 408 N.Y.S.2d 801, 802 (2d Dep't 1978); *see also Catalogue Serv. of Westchester, Inc. v. Henry*, 107 A.D.2d 783, 784, 484 N.Y.S.2d 615, 616 (2d Dep't 1985) ("remembered information as to specific needs and business habits of particular customers is not confidential").

◼ The law focuses on the source of the information used by a former employee to solicit an employer's customers. If information is known only because of the former employment relationship, it may not be used to solicit customers. *Town & Country House & Home Serv., Inc. v. Newbery*, 3 N.Y.2d 554, 558–59, 170 N.Y.S.2d 328, 147 N.E.2d 724 (1958); *Advanced Magnification*, 135 A.D.2d at 891, 522 N.Y.S.2d at 289 (employee's right to compete does not extend so far that employee can unlawfully seize employer's property with impunity). As the New York Court of Appeals has stated:

> [An] employee may not solicit an employer's customers who are not openly engaged in business in advertised locations or whose availability as patrons cannot readily be ascertained but whose trade and patronage have been secured by years of business effort and activity, and the expenditure of time and money, constituting a part of the good will of a business which enterprise and foresight built up.

*Town & Country House*, 3 N.Y.2d at 558, 170 N.Y.S.2d 328, 147 N.E.2d 724; *accord Leo Silfen*, 29 N.Y.2d at 392–93, 328 N.Y.S.2d 423, 278 N.E.2d 636; *Barone v. Marcisak*, 96 A.D.2d 816, 465 N.Y.S.2d 561, 562 (2d Dep't 1983); *see also Advanced Magnification*, 135 A.D.2d at 891, 522 N.Y.S.2d at 289 (it is "patently unfair" to allow employee to use information which employer gathered by considerable expense and effort).

On the other hand, information known or accessible to an employee from other sources may be used to solicit customers. *Town & Country House*, 3 N.Y.2d at 558–59, 170 N.Y.S.2d 328, 147 N.E.2d 724; *accord Advanced Magnification*, 135 A.D.2d at 891, 522 N.Y.S.2d at 289; *American Printing Converters, Inc. v. JES Label & Tape, Inc.*, 103 A.D.2d 787, 477 N.Y.S.2d 660, 661–62 (2d Dep't 1984); *Continental Dynamics*, 408 N.Y.S.2d at 802.

◼ From this background, a number of courts have distilled elements of an unfair competition cause of action. *Merritt Forbes & Co. v. Newman Invest. Secur., Inc.*, 604 F.Supp. 943, 957 (S.D.N.Y.1985). To state a valid cause of action for unfair competition based on misappropriation, a plaintiff must show: (1) the defendant obtained access to the idea or information at issue through an abuse of a confidential or fiduciary relationship with the plaintiff, or via some fraud or deception; (2) the plaintiff disclosed what amounted to a trade secret to the defendant and the defendant made use of this disclosure; and (3) the defendant's use of the idea deprived the plaintiff of an opportunity to reap its due profits from the idea. *Id.; Werlin*, 528 F.Supp. at 464.

◼ Apollo has not demonstrated a likelihood of success on its unfair competition claim, even if Centrosphere obtained the confidential information described by Apollo, including access to the prices and discounts offered to NAPOCOR.

It is not clear, for instance, whether Centrosphere has acted in bad faith and abused its fiduciary relationship with Apollo to obtain the information in question. Apollo does not argue that Centrosphere physical-

ly copied or refused to return secret information. Although Apollo emphasizes Centrosphere's statement that Centrosphere will supply NAPOCOR with "the same fuel additives of the same specifications with no deviation from the original formulation," this statement is unavailing. Moving Brief at 7, 22 (citing Becker Aff., Ex. Q). As indicated above, Apollo claims to have patents on its fuel additives. Becker Aff., ¶ 12. If these patents do exist, it appears Apollo has a cause of action for patent violation. Nevertheless, it does not appear Centrosphere can be enjoined for a trade secret violation because it re-reproduced a patented product.

Apollo also fails to establish exactly what Centrosphere gained from its contact with Apollo. Because Centrosphere had contacts at NAPOCOR prior to working with Apollo on the Trial Contract, it cannot be said that Centrosphere's current solicitation of NAPOCOR is due entirely to customer information received from Apollo. Widjaja Aff., ¶¶ 5–10; Becker Aff., ¶ 17. Kukin Aff., ¶¶ 5(a)–(d); Kukin Exhibits, Exs. 1–3, 5, 8. Similarly, because it appears that Centrosphere personnel had worked with Kober and marketed fuel additives prior to dealing with Apollo, it is unclear what information Centrosphere already knew prior to the Trial Contract.

Finally, even if the information in question was only available to Centrosphere by virtue of its contact with Apollo, Apollo has not established that Centrosphere is doing anything more than utilizing information that its technicians have observed, incorporated into their experience and now are recalling from memory. *Leo Silfen,* 29 N.Y.2d at 391–92, 328 N.Y.S.2d 423, 278 N.E.2d 636; *Levine,* 132 A.D.2d at 532–33, 517 N.Y.S.2d at 271; *Catalogue Serv.,* 107 A.D.2d at 784, 484 N.Y.S.2d at 616; *Continental Dynamics,* 408 N.Y.S.2d at 802; *see supra* at pp. 1195–1196.

■ As indicated above, Apollo has not demonstrated that the information it seeks

to protect actually constitutes trade secrets. *See supra* at pp. 1200–1202. Apollo has failed to satisfy the second element of an unfair competition claim. In appropriate circumstances, information on pricing, discounts and other relevant customer data may enable an agent to take unfair advantage of its principal and therefore constitute protectible trade secrets. *Ecolab,* 753 F.Supp. at 1112; *Webcraft,* 674 F.Supp. at 1044–47; *Giffords Oil,* 106 A.D.2d at 611, 483 N.Y.S.2d at 106. In this case, unlike most cases involving customer information, Centrosphere is not attempting to steal a significant portion of Apollo's clientele by undercutting its prices.[61] Rather, Centrosphere has solicited only NAPOCOR, an entity with which Centrosphere had contacted prior to the venture with Apollo and which currently is only a potential client of Apollo.

■ Given Centrosphere's past dealings with NAPOCOR, it is not apparent why Centrosphere could not obtain the price information and data regrading NAPOCOR's equipment and plant needs directly from NAPOCOR, and thereafter offer to do the job for less money. Use of information obtainable from other known sources is not unfair competition. *Town & Country House,* 3 N.Y.2d at 558–59, 170 N.Y.S.2d 328, 147 N.E.2d 724; *accord American Printing,* 103 A.D.2d at 788, 477 N.Y.S.2d at 661–62; *Continental Dynamics,* 408 N.Y.S.2d at 802.

On the record established by Apollo, it has not been established that Centrosphere "has misappropriated [Apollo's] labors and expenditures." *Saratoga,* 625 F.2d at 1044; *Werlin,* 528 F.Supp. at 464. Resolution of an unfair competition claim "requires a complex factual analysis of a variety of factors," *Capitaland,* 134 A.D.2d at 722, 521 N.Y.S.2d at 203, and the issues left unresolved by Apollo are important to that analysis. Apollo may have a viable claim for unfair competition against Centrosphere but, by failing to address these

---

**61.** In addition, it is not clear that Centrosphere even had access to the prices at which Apollo was subsequently offering fuel additives to NAPOCOR. *See* Moving Brief at 6 (commenting

that Centrosphere offered to sell NAPOCOR products "at prices it *believed* were below those being offered by Apollo") (emphasis added).

issues, Apollo has failed to demonstrate a probability of success on this claim.

### d. Intentional Interference With Prospective Contractual Relations

Apollo's final claim is that Centrosphere has tortiously interfered with Apollo's prospective business relations with NAPOCOR. According to Apollo, Centrosphere "owed Apollo a fiduciary duty not to use its confidential trade secrets to compete with Apollo for the NAPOCOR business." Moving Brief at 26. Because Centrosphere has "blatantly flouted this fiduciary duty," Apollo claims it is liable for the tort of interference. *Id.*

▉▉▉▉ Intentional interference with prospective contractual relations is a recognized tort in New York. *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 190–91, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980). To prevail on such a claim, the plaintiff must show that a contract would have been entered into but for the actions of the defendant. *Harden, S.P.A. v. Commodore Electronics, Ltd.*, 90 A.D.2d 733, 734, 455 N.Y.S.2d 792, 795 (1st Dep't 1982). In addition, the plaintiff must show either that the defendant's sole purpose was to damage the plaintiff or that the means employed to induce termination of the relationship were wrongful. *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 269 (2d Cir.1987); *Sutton Import–Export Corp. v. Starcrest*, 762 F.Supp. 68, 71 (S.D.N.Y.1991); *International Minerals & Res., Inc. v. Pappas*, 761 F.Supp. 1068, 1075 (S.D.N.Y.1991); *Pennsylvania Eng. Corp. v. Islip Res. Recovery Agency*, 710 F.Supp. 456, 468 (E.D.N.Y.1989); *Lerman v. Medical Assoc. of Woodhull, P.C.*, 160 A.D.2d 838, 839–40, 554 N.Y.S.2d 272, 273 (2d Dep't 1990); *Harden*, 90 A.D.2d at 734, 455 N.Y.S.2d at 794.

▉▉▉ "Wrongful means" have been defined as including physical violence or threats of physical violence, fraud or misrepresentation, civil suits, criminal prosecutions and some degrees of economic pressure. *Guard–Life*, 50 N.Y.2d at 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (citing Restatement (Second) of Torts § 768 comment e, § 767, comment c); *see also International Minerals*, 761 F.Supp. at 1075; *Perry v. International Transport Workers' Fed.*, 750 F.Supp. 1189, 1207 (S.D.N.Y. 1990). A defendant's breach of its fiduciary duty may also constitute wrongful means. *Mayo, Lynch & Assocs., Inc. v. Fine*, 148 A.D.2d 425, 426, 538 N.Y.S.2d 579, 580 (2d Dep't 1989).

▉▉▉ Mere persuasion alone, even though it is knowingly directed at interference with a prospective contract, will not be enough to constitute wrongful means. *Guard–Life*, 50 N.Y.2d at 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (citing Restatement (Second) of Torts § 768 comment e, § 767, comment c). Similarly, if the defendant's conduct is intended, at least in part, to advance its own competing interests, a tortious interference claim will fail unless the means employed include criminal or wrongful conduct.[62] *Id.; accord PPX*, 818 F.2d at 269; *Mayo, Lynch*, 148 A.D.2d at 425, 538 N.Y.S.2d at 580; *Olympia House, Inc. v. Elghanayan*, 111 A.D.2d 674, 677–78, 491 N.Y.S.2d 163, 166 (1st Dep't 1985); *see also Masten v. C.D.I. Travel, Inc.*, 178 A.D.2d 248, 577 N.Y.S.2d 59, 60 (1st Dep't 1991) (complaint must allege wrongful means employed by defendant with specificity).

▉▉▉ Apollo has failed to demonstrate a likelihood of success on its claim for tortious interference. Apollo does not argue that Centrosphere's sole purpose in soliciting NAPOCOR's business is to harm Apol-

---

**62.** A more stringent showing is required in the case of interference with a prospective contract than for an existing contract. *Guard–Life*, 50 N.Y.2d at 191, 428 N.Y.S.2d 628, 406 N.E.2d 445; *see also Perry*, 750 F.Supp. at 1207; *Pennsylvania Eng.*, 710 F.Supp. at 464. A prospective contractual relation is afforded less protection under New York law than an existing contract because its is "less substantive [and] more speculative." *Guard–Life*, 50 N.Y.2d at 190–91, 428 N.Y.S.2d 628, 406 N.E.2d 445 ("status as a competitor does not protect the interferer from the consequences of his interference an existing contract, [but] it may excuse him from the consequences of interference with prospective contractual relationships").

lo. *See* Moving Brief at 26. Although Apollo contends that Centrosphere's sole purpose in this affair is "an effort to impose extortionate terms of a 'buy-out'" on Apollo, Kukin Aff., ¶ 22, this assertion is unsupported. While Apollo may object to the price set by Centrosphere on this buy-out, it appears that the buy-out proposal has been endorsed by Apollo. Becker Aff., ¶ 36, Ex. E (letter from Apollo to Centrosphere stating: "We were willing to compensate you for [your] work ... by providing some sort of 'buy-out' of each shareholder....").

Absent a showing that Centrosphere lacks a competitive purpose, Apollo must show that Centrosphere has engaged in wrongful conduct in dealing with NAPOCOR. Apollo has not made such a showing. As previously discussed at length, Apollo has not demonstrated the information provided to Centrosphere constitutes trade secrets or that the information used by Centrosphere to deal with NAPOCOR was received entirely from Apollo. *See supra* at pp. 1200–1202, 1204–1205.

Finally, the communications from Centrosphere to NAPOCOR, on which Apollo relies, are general in nature. Becker Aff., Exs. O, R, T. Although these letters do indicate the potential savings for NAPOCOR if the Second Trial Order is placed with Centrosphere instead of Apollo, these letters do not reveal or discuss any specific of the information regarded by Apollo as trade secrets.[63] Mere persuasion alone, even though it is knowingly directed at interference with a prospective contract, will not be enough to constitute wrongful means. *Guard–Life*, 50 N.Y.2d at 191, 428 N.Y.S.2d 628, 406 N.E.2d 445. Apollo has not demonstrated that Centrosphere's letters to NAPOCOR are anything more than mere persuasion.

---

63. As indicated previously, the prices at which Apollo was willing to sell additives to NAPOCOR have not been demonstrated to be *trade secrets* because Centrosphere may well have obtained this information from NAPOCOR. *See supra* p. 1204.

### 3. *Irreparable Injury*

In order to demonstrate irreparable injury, the moving party "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm." *Instant Air*, 882 F.2d at 801 (emphasis added) (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 356 & n. 9 (3d Cir.1980)).

The Supreme Court, in speaking to the irreparable injury requirement, has stated:

> [I]t seems clear that the temporary loss of income, ultimately to be recovered, does not constitute irreparable injury.... "The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

*Sampson v. Murray*, 415 U.S. 61, 90, 94, 94 S.Ct. 937, 952–53, 954, 39 L.Ed.2d 166 (1974) (emphasis original) (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.D.C.1958); quoted in *Instant Air*, 882 F.2d at 801).

The Circuit has towed a similarly strict line on what constitutes irreparable injury. In *Frank's GMC*, the court stated that "[t]he availability of adequate monetary damages belies a claim of irreparable injury." 847 F.2d at 102; *accord Morton*, 822 F.2d at 372. In *Instant Air*, the court stated: "[W]e have never upheld an injunction where the claimed injury constituted a loss of money or loss capable of recoupment in a proper action at law."[64] 882

---

64. Recently, the Circuit has stated in trademark cases that irreparable injury includes the loss of reputation, of trade and of goodwill. *S & R Corp.*, 968 F.2d at 378; *Opticians Ass'n*, 920 F.2d at 195. Aside from the fact that this is not a trademark case, Apollo does not argue that Centrosphere is damaging its reputation or good-

F.2d at 801 (quoting *Arthur Treacher's*, 689 F.2d at 1145); *see also Morton*, 822 F.2d at 372 (no injunction to prevent termination of plaintiff's employment despite fact that significant cash flow problems and financial distress could follow).

*Frank's GMC* involved a dispute arising from the obligations of a franchise relationship. Frank's GMC had been a franchisee of General Motors Corp. ("GM") since 1937, and since 1973 had sold a full line of GM trucks. 847 F.2d at 100. In 1986, GM advised Frank's GMC that it had entered into a joint venture with Volvo. *Id.* Pursuant to this venture, GM was no longer going to manufacture or supply parts for its former line of heavy-duty trucks. *Id.* Frank's GMC was ordered to cease taking orders for GM heavy-duty trucks and was advised that requests for parts would only be filled on a case-by-case basis. *Id.* Moreover, Frank's GMC was not selected to market or sell the new line of trucks that was to be manufactured jointly by GM and Volvo. *Id.*

Frank's GMC sued GM for damages and for an injunction preventing GM from discontinuing its supply of heavy-duty trucks and parts. *Id.* Frank's GMC asserted that it had lost and would continue to lose significant sales from not being able to sell a full line of GM trucks. *Id.* at 102. According to Frank's GMC, this loss of sales would cause a corresponding decrease in service contracts, exacerbating the loss to its service business that had already been caused by GM's failure to supply parts and warranty support. *Id.* All of these, Frank's GMC claimed, would cause irreparable harm to its ongoing business. *Id.*

The district court granted the injunction in favor of Frank's GMC; the Circuit reversed. The Circuit noted that "what stands out in all of Frank's GMC's arguments is that, absent the ad interim relief provided by the district court, Frank's GMC would stand to lose sales and service customers, and therefore profits." *Id.* The court continued: "Even assuming for purposes of argument that Frank's GMC's

assertions are true and that it will in fact suffer substantial lost profit as a result of GM's withdrawal from the heavy-truck market, the harm flowing therefrom is compensable in money damages ... and cannot satisfy the irreparable injury requirement." *Id.*

A similar result was reached in *Instant Air Freight*, 882 F.2d 797. In that case, Instant Air Freight ("Instant Air") and C.F. Air Freight ("C.F.") entered into a four year contract under which Instant Air would provide air freight handling services for C.F. *Id.* at 798. Handling C.F.'s freight constituted eighty percent of Instant Air's business. *Id.* Before the contract had expired, C.F. informed Instant Air that its Elizabeth, New Jersey terminal would be closed. *Id.* It was through this terminal that all of the C.F. freight handled by Instant Air passed. *Id.*

In seeking a preliminary injunction, Instant Air argued that (1) its business would be completely destroyed, (2) it would be required to lay off most, if not all of its seventy employees and (3) its goodwill and business reputation would be destroyed. *Id.* at 801. In short, Instant Air argued, it would "lose everything it has built over the past two decades." *Id.*

Recognizing that, absent an injunction, Instant Air would "undoubtedly be forced to shutdown or significantly curtail its operations," the district court granted the injunction. *Id.* at 798–99. On appeal, the Circuit reversed, stating: "The bottom line in this case, as in *Frank's GMC*, centers on the loss of money which Instant [Air] will suffer as a result of the contract termination. Here the money damages which Instant [Air] alleges are capable of ascertainment and award at final judgement if Instant [Air] prevails. These money damages will fully compensate Instant [Air] for its losses." *Id.* at 801.

In *Arthur Treacher's*, the plaintiff also argued that it would go out of business without an injunction requiring one of its franchises to pay two hundred thousand dollars in back royalties. 689 F.2d at 1141.

will. Moving Brief at 8–9, 13. Rather, Apollo's only claim is that Centrosphere is improperly

utilizing the goodwill developed by Apollo with NAPOCOR from the Trial Program. *Id.*

In granting the injunction, the district court reasoned: "If Arthur Treacher's ultimately prevails at trial, any award of money damages could hardly compensate if it is bankrupt and without a franchise system which took years to develop." *Id.* (quoting district court). Circuit rejected the argument this argument and denied the injunction.

Finally, the Circuit has indicated that "[e]stablishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a clear showing of immediate irreparable injury." *Hoxworth,* 903 F.2d at 205 (quoting *Ecri v. McGraw-Hill, Inc.,* 809 F.2d 223, 225 (3d Cir.1987)).

Apollo argues that Centrosphere's conduct has "jeopardized and continues to jeopardize Apollo's efforts to obtain a long term commitment from NAPOCOR to purchase fuel additives and related technologies and services." Moving Brief at 26–29. This injury, Apollo contends, is irreparable and cannot be compensated by money damages. *Id.* at 28–29.

In attempting to establish irreparable injury, Apollo describes a number of different types of injuries. First, Apollo points to the suspension two existing contracts— the New Contract and the Interim Contract—both of which have not been ratified by NAPOCOR's board of directors "because of the turmoil caused by Centrosphere's actions." *Id.* at 27–28. Second, Apollo points to the loss of contracts not yet negotiated. Specifically, Apollo states:

> Centrosphere's actions threaten Apollo with irreparable injury, causing it not only to lose millions of dollars worth of contracts to supply fuel additives to NAPOCOR's Malaya ... Plant, but also to lose the ability to supply fuel additives to

NAPOCOR's three other oil fired facilities (including [the] Bataan and Sucat [Plants]). Centrosphere's actions also threaten Apollo's efforts to supply other technologies ... to Apollo's coal fired power facilities. Apollo has extended a great deal of time and effort over the last two years in attempting to secure NAPOCOR's business. Because of the difficulty in measuring the damages it will sustain, it is clear that Centrosphere's conduct, if left unchecked, will cause Apollo irreparable harm.

*Id.* at 28–29; *see also* Complaint, ¶ 31. Finally, although Apollo does not assert a claim to protect trade secrets, it argues that because the case involves trade secrets (as well as a non-compete clause), an injunction is necessary. *Id.* at 26–27.

### a. The New Contract and the Interim Contract

Apollo's claim that loss of the New Contract and the Interim Contract merits injunction relief is incorrect. In its own submissions, Apollo specifies the value of these contracts. The New Contract, Apollo admits, "represents a total order to Apollo of $6.5 million." Becker Aff., ¶ 47 & Ex. M; Moving Brief at 28. Similarly, the Interim Contract calls for the purchase of "an additional two month supply of fuel additives for approximately $770,000." Becker Aff., ¶ 49 & Ex. N.

 Should Apollo lose the New Contract or the Interim Contract or both because of Centrosphere, the amount of the loss has been quantified and is compensable by money damages.[65] Because these figures are known, there is no difficulty of precise measurement.[66] *Barone,* 465

---

**65.** Apollo's contention that it has invested a significant amount of time and effort to negotiating these contracts is irrelevant. Reply Brief at 14–15. As indicated by *Frank's GMC, Instant Air* and *Arthur Treacher's,* the loss of significant investments of time, effort and business development do not justify the issuance of injunction, particularly where damages are readily ascertainable. *Instant Air,* 882 F.2d at 801; *Frank's GMC,* 847 F.2d at 102; *Arthur Treacher's,* 689 F.2d at 1141. Furthermore, where irreparable harm does not exist, a district court has no

equitable discretion to issue an injunction. *Frank's GMC,* 847 F.2d at 102, n. 3.

**66.** Money damages are the appropriate remedy in claims involving unfair competition and interference with prospective contractual relations. *International Minerals,* 761 F.Supp. at 1079 (interference claim); *Guard-Life,* 50 N.Y.2d at 191 & n. 6, 428 N.Y.S.2d 628, 406 N.E.2d 445 (same); *Allan Dampf, P.C. v. Bloom,* 127 A.D.2d 719, 720, 512 N.Y.S.2d 116, 117 (2d Dep't 1987) (unfair competition); *Barone,* 465 N.Y.S.2d at 562 (same).

N.Y.S.2d at 562 (measure of damages for wrongful diversion of good will or competition in breach of contract is loss sustained by reason of breach, including profits of which plaintiff was deprived by defendant's acts).

▋ Apollo has neither demonstrated that it has lost either the New Contract or the Interim Contract nor established that the loss of these contracts is immediate and probable. Moreover, Apollo has not established such a loss is irreparable. Rather, as Apollo admits, ratification of these contracts by the NAPOCOR board of directors has merely been suspended. Becker Aff., ¶¶ 48–49; Kukin Aff., ¶ 16. In this sense, the loss of these contracts and any accompanying damages are purely speculative. The mere risk of harm does not constitute irreparable injury and may not provide the basis for injunctive relief. *Hoxworth,* 903 F.2d at 205; *Ecri,* 809 F.2d at 225.

### b. The Potential Contracts

Apollo's contention that other potential contracts with NAPOCOR may be lost does not constitute irreparable injury and cannot provide the basis for injunctive relief. As indicated by the Circuit in *Frank's GMC, Instant Air* and *Arthur Treacher's,* the loss of potential business opportunities, profits, customers or contracts is compensable by money damages and does not constitute irreparable injury.[67] *Instant Air,* 882 F.2d at 801; *Frank's GMC,* 847 F.2d at 102; *Arthur Treacher's,* 689 F.2d at 1141. Moreover, Apollo continually recognizes that losing these contracts will result in monetary damage. Complaint, ¶¶ 31, 55, 59; Moving Brief at 28–29.

Even if Apollo can prove that these opportunities have been lost because of Centrosphere, any damage suffered by Apollo is susceptible of precise measurement, based upon either the contract proposed by Apollo or the price received by the contract winner. For example, Centrosphere has been awarded a contract to supply fuel additives to NAPOCOR's Sucat Plant. Becker Aff., ¶ 58 & Exs. S–T. The price for this contract is seven hundred ten thousand dollars. *Id.* Although Apollo does not appear to have bid on this contract, should it be established that Apollo was injured by Centrosphere's obtaining this contract, Apollo's damages are measurable.

In any event, a potential loss on these contracts is entirely speculative. Apollo has not demonstrated that such contractual opportunities for it exist or will exist. With the exception of the Malaya and Bataan Plants, Apollo does not appear to have negotiated with NAPOCOR to supply additives to any other NAPOCOR power facility. Moreover, Apollo concedes that past attempts to supply additives to the Philippines have made it hesitant to do business there because of the country's unstable political situation. Kukin Aff., ¶ 5(c). As Centrosphere also points out, Apollo lacks a license to do business in the Philippines[68] and may not even be able to do business directly with NAPOCOR.[69] Widjaja Aff., ¶ 32.

Apollo has not demonstrated it is about to suffer immediate and irreparable harm with regard to these potential contracts.

### c. Trade Secrets

▋ In cases involving trade secrets, courts have shown a willingness to issue injunctions to prevent the disclosure of trade secrets. *SI Handling Sys., Inc. v. Heisley,* 753 F.2d 1244, 1263 (3d Cir.1985); *BIEC Int'l, Inc. v. Global Steel Servs., Ltd.,* 791 F.Supp. 489, 539–48 (E.D.Pa. 1992); *Campbell Soup Co. v. Conagra,* 801 F.Supp. 1298 (D.N.J.1991). Injunctive relief, however, is only appropriate where the elements of a trade secret claim are

---

**67.** Significantly, Apollo does not once mention or discuss *Frank's GMC, Instant Air* or *Arthur Treacher's* in its discussion of irreparable injury. Moving Brief at 26–29; Reply Brief at 12–15.

**68.** Apollo did not address this contention in either the Reply Brief or the Kukin Aff.

**69.** The processes revealed by Apollo to Centrosphere specifically related to NAPOCOR's oil-fired power facilities. It is not clear how Centrosphere poses a threat to Apollo's ability to enter into contracts for NAPOCOR's coal-fired plants, which appear to utilize different methods of pollution control. Kukin Exhibits, Ex. 4.

established. *SI Handling*, 753 F.2d at 1265.

■ In making this determination, federal courts apply the applicable state law. *SI Handling*, 753 F.2d at 1255. To assert a trade secrets claim under New York law, a plaintiff must show it possessed a trade secret and the defendant used that secret either in breach of an agreement, confidence or duty, or as a result of discovery by improper means. *Integrated Cash*, 920 F.2d at 173; *Integrated Cash*, 732 F.Supp. at 375.

Even with such a showing, more than the risk of irreparable harm must be demonstrated. *Continental Group*, 614 F.2d at 359. As the *Continental Group* court stated: "There must be an imminent threat of the allegedly harmful disclosure.... 'A trade secret will not be protected by the extraordinary remedy of injunction on mere suspicion or apprehension of injury.' " 614 F.2d at 358–59 (quoting *Allis–Chalmers Mfg. Co. v. Continental Aviation & Eng. Corp.*, 255 F.Supp. 645, 654 (E.D.Mich.1966)); *see also Bay State Lighting Co. v. Voight Lighting Indus., Inc.*, 224 U.S.P.Q. 708, 1984 WL 1450 at 12 (D.N.J. 17 July 1984) ("injunction is not automatic merely because a trade secret claim is alleged and ought not to be granted absent satisfaction of all prerequisites for equitable relief").

As discussed previously, Apollo has not demonstrated that (1) its fuel additive process constitutes a protectible trade secret, in whole or in part, (2) Centrosphere is prohibited from utilizing or disclosing those aspects of Apollo's system which have become part of its acquired experience and (3) that disclosure of these alleged trade secrets is imminent. *See supra* pp. 1194, 1200–1202, 1203–1204; *see also Bay State Lighting*, 224 U.S.P.Q. 708, 1984 WL 1450 at 16–17 (failure to prove defendants had already disclosed trade secrets, or that they intended to or inevitably would have disclosed those secrets, justified denial of preliminary injunction).

■ To the extent Apollo seeks protection for its trade secrets, it is not to prevent disclosure of those secrets. Rather, Apollo seeks to prevent Centrosphere from using this information to compete with Apollo in procuring contracts with NAPOCOR. Moving Brief at 26–28; Reply Brief at 12–14. As also discussed previously, the loss of a contract through unfair means is the type of injury for which damages are ascertainable and appropriate. *See supra* n. 66; *see also Hunterdon Transformer*, 1990 WL 10342 at *1, 1990 U.S.Dist. LEXIS 1382 at *3–4 (improper use of trade secrets to pirate away business compensable by money damages and injunction was not was appropriate); *Bay State Lighting*, 224 U.S.P.Q. 708, 1984 WL 1450 at 11–12 (same, for unauthorized use of secret design in performing airport lighting contract).

d. Injunctions Even Where Money Damages Appropriate

■ In certain limited instances, the Circuit has recognized that a preliminary injunction is appropriate even though the plaintiff's injury is compensable by money damages. *Hoxworth*, 903 F.2d at 205–06; *Instant Air*, 882 F.2d at 801–02; *Morton*, 822 F.2d at 371; *United Steelworkers of Am. v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1280 (3d Cir.1979). The following circumstances are significant: (1) the difficulty of proving damages with reasonable certainty, (2) the difficulty of procuring a suitable substitute performance by means of money awarded as damages and (3) the likelihood that an award could not be collected.[70] *Id.* at 802 (citing Restatement (Second) of Contracts § 360).

**70.** Irreparable injury is not established merely because a defendant's assets are maintained in or transferred to a foreign country and therefore may be potentially uncollectible. *Hoxworth*, 903 F.2d at 207. As the *Hoxworth* court explained, a finding of irreparable injury based on overseas asset transfers, "appears somewhat problematic" and "presents difficult issues of international law" regarding the enforcement of judgments abroad. *Id.* That complexity "counsels against our issuing a ruling" of irreparable injury without the showing of a precise legal theory of uncollectibility by the plaintiff. *Id.* No such showing has been made or attempted by Apollo. In addition, it appears the difficulty of enforcing a money judgement in a foreign

Apollo argues an injunction is warranted in this case because Centrosphere "has no significant assets" and a money damages award would be "simply ineffective." Reply Brief at 14; Reply Brief at 3, 14. Absent statements by Apollo that Centrosphere failed to maintain its financial commitments under the Agency Contracts and borrowed money from Apollo, *see* Kukin Aff., ¶ 9; Kukin Exhibits, Exs. 13–14, Apollo has not supplied any proof or documentation to support its contention that Centrosphere is without assets. Nor has Apollo supplied specific facts or figures to indicate that Centrosphere failed to carry its share of the financial burden.

 While the circumstances cited by Apollo may indicate a lack of assets, insolvency is not the only explanation for such status. In addition, Centrosphere maintains that it "performed all its obligations under the contract." Reply Brief at 16. Where no clear factual record exists apart from the general statements of the plaintiff, a finding of irreparable injury is not warranted. *Instant Air*, 882 F.2d at 803; *Arthur Treacher's*, 689 F.2d at 1146. Similarly, a preliminary injunction cannot be issued when there are disputed issues of fact. *Charles Simkin*, 289 F.2d at 29; *Oxford–Evergreen*, 769 F.Supp. at 1343; *Hunterdon Transformer*, 1990 WL 10342 at *1, 1990 U.S.Dist. LEXIS 1382 at *4.

Apollo also argues, without ever explaining, that damages in this case will be difficult to calculate. Moving Brief at 29; Reply Brief at 3. This argument is also without merit. As explained above, Apollo's potential damages from lost contracts and improperly used trade secrets are capable of calculation. *See supra* at pp. 1208–1210.

Because Apollo has failed to articulate and adduce proof of actual or imminent harm which cannot otherwise be compensated by money damages, it has failed to sustain the substantial burden of showing irreparable harm. *Frank's GMC*, 847 F.2d at 102–03.

country is no greater, and may be less, than the

### 4. *Balance of Hardships*

 In deciding whether injunctive relief is appropriate, the hardships to the respective parties must be balanced. *Opticians Ass'n*, 920 F.2d at 197; *Frank's GMC*, 847 F.2d at 102. The purpose behind this balancing is to ensure that the issuance of an injunction would not harm the defendant more than a denial would harm the plaintiff. *Opticians Ass'n*, 920 F.2d at 197; *Ecri*, 809 F.2d at 226.

The balance of hardships in this case favors not issuing the requested injunction. Centrosphere was founded prior to its contact with Apollo for the purpose of supplying fuel additives and related technology to entities in the Philippines. Widjaja Aff., ¶ 10; Opp. Brief at 2–3. By prohibiting Centrosphere from engaging in this activity, the Non–Compete Clause essentially prohibits Centrosphere from functioning at all. In contrast, if the injunction is not issued, Apollo still may pursue its negotiations with NAPOCOR and still may be awarded the contracts that have been suspended. Even if Apollo should lose these contracts, the loss is measurable and compensable by money damages following trial on the merits, if Apollo is successful.

Apollo suggests that, absent serious questions going to the merits, the balance of hardships need not be considered. Moving Brief at 30. Even if this is true, Apollo has not demonstrated the likelihood of its success on the majority of its claims. Moreover, the one claim for which Apollo has shown a likelihood of success, the claim that Centrosphere purported to act as Apollo's agent following the termination of its agency, is no longer relevant to a discussion of the ongoing harm to Apollo. Centrosphere is no longer purporting to act as Apollo's agent and NAPOCOR has been notified that Centrosphere is no longer authorized to act for Apollo. Kukin Aff., ¶ 18; Becker Aff., ¶ 51, Ex. P; Moving Brief at 6.

### 5. *Public Interest*

 The final consideration in the preliminary injunction analysis is whether the

difficulty of enforcing an injunction abroad.

issuance of a preliminary injunction furthers the public interest. *Opticians Ass'n,* 920 F.2d at 197. Neither party has argued nor does it appear that the public interest significantly affects the analysis in this case. Where the public interest has little to add to the other preliminary injunction factors, it is not considered. *Hoxworth,* 903 F.2d at 208; *Instant Air,* 882 F.2d at 803.

*Conclusion*

For the reasons set forth above, the Apollo motion for a preliminary injunction is denied and the Centrosphere cross-motion to dismiss for lack of personal jurisdiction and for improper process, or, if the preliminary injunction were to be granted, to make the preliminary injunction mutually enforceable, is also denied.[71]

---

**71.** Because Apollo's preliminary injunction motion is denied, it is not necessary to consider Centrosphere's arguments that (1) the injunction should be mutually-enforced and (2) a bond is required. Opp. Brief at 28–29.